IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| RANDY LYN MCKINNEY, | ) | |
| | ) | |
| Petitioner, | ) | Case No. CV-96-177-S-BLW |
| | ) | |
| v. | ) | **CAPITAL CASE** |
| | ) | |
| GREG FISHER, Warden, | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| Respondent. | ) | |
| _____ | ) | |

## INTRODUCTION

Before the Court in this capital habeas corpus matter are Petitioner's motions for leave to amend and for an evidentiary hearing. (Docket Nos. 201 & 203.) The parties have fully briefed the issues, and in the interest of avoiding further delay, the Court will decide these matters on the pleadings, briefs, and record without oral argument. D. Idaho L. Civ. R. 9.2(h)(5).

For the reasons set forth below, the Court will grant Petitioner's request to amend his Petition to include two new habeas claims, but the Court concludes that an evidentiary hearing is unnecessary on any issues or claims.

## BACKGROUND

In 1982, Randy McKinney was sentenced to death for murdering Robert Bishop, Jr. For the next twenty-five years, he has pursued relief in the state and

**Memorandum Decision and Order - 1**

federal courts, resulting in four published opinions from the Idaho Supreme Court.[1]

The parties are familiar with this lengthy procedural history, and it will be

recounted here only to the extent that it is relevant.

## MOTION FOR LEAVE TO AMEND

McKinney has requested the Court to grant him leave to file a Third

Amended Petition containing a new claim of prosecutorial misconduct, in which he

alleges that one or both of the trial prosecutors physically altered the murder

weapon during the criminal trial (Claim 36).  He also seeks to include a claim for

relief based upon his actual innocence (Claim 37).  The Court previously denied

leave to include these claims, in part because the prosecutorial misconduct issue

was still pending in state court and in part because McKinney had delayed bringing

the actual innocence claim.  (Docket No. 184, pp. 12-15.)  The state court matter

has since concluded, and he has now renewed the request.

The Court will exercise its discretion under Rule 15(a) of the Federal Rules

of Civil Procedure and allow the proposed amendments.  The Court does not find

that McKinney has acted in bad faith, and there will be no prejudice to Respondent

or undue delay, because, as will become evident, these claims are meritless and

---

[1]*State v. McKinney*, 687 P.2d 570 (Idaho 1984) (*McKinney I*); *McKinney v. State*, 772 P.2d 1219, 1222 (Idaho 1989) (*McKinney II*); *McKinney v. State*, 992 P.2d 144 (Idaho 1999) (*McKinney III*); *McKinney v. State*, 150 P.3d 283 (Idaho 2006) (*McKinney IV*).

**Memorandum Decision and Order - 2**

will be denied without further proceedings.

It is true, as Respondent notes, that the Court had denied McKinney's earlier request to bring the actual innocence claim with prejudice.  (Docket No. 184, pp. 13-15.)  Nevertheless, he continues to argue that his innocence should excuse the procedural default of other habeas claims, a type of *procedural* "claim" given shape in *Schlup v. Delo,* 513 U.S. 298 (1995), and the Court will be required to take up the issue in one form or another.  For this reason, and to reach some finality on the matter, the Court will reconsider its previous denial, allow the amendment, and address the actual innocence issue in this Memorandum Decision.

## MOTION FOR AN EVIDENTIARY HEARING

McKinney requests an evidentiary hearing on the merits of Claims 1(a)(d)(f), 5, 12, 13, 35, and 37.[2]  He also seeks an evidentiary hearing to establish cause and prejudice to excuse the procedural default of his prosecutorial misconduct and *Brady* claims, and to show that he is innocent.

The Court is not persuaded that a hearing is required or necessary on any of these matters.  To the extent that McKinney wishes to offer new evidence on the

---

[2] McKinney includes Claim 6 in his Motion, but he has provided no briefing in support. In any event, this is a record-based claim that does not warrant an evidentiary hearing.  Likewise, no hearing is required to prove post-conviction counsel's alleged conflict of interest, lack of resources, or inexperience.  (Docket No. 203-1, p. 2.)  The Court has already addressed that issue in some detail and will not revisit it here.  (Docket No. 166, pp. 29-32.)

**Memorandum Decision and Order - 3**

merits of Claims 1(a)(b)(d), 5, 12, and 13, his lack of diligence in presenting that evidence in state court precludes him from doing so now, and he must instead show that he is entitled to relief based on the record that was before the state court. Claim 35 (unreasonable delay) fails as a matter of law, and it will be dismissed on that basis. Finally, an evidentiary hearing is not required on the prosecutorial misconduct and *Brady* claims (Claims 7 and 36), or to prove actual innocence (Claim 37), because McKinney has not alleged facts that, if true, would entitle him to relief. These claims will also be dismissed.

<u>Standard of Law</u>

The Antiterrorism and Effective Death Penalty Act (AEDPA) substantially limited a federal district court's discretion to conduct evidentiary hearings in habeas cases, reflecting Congress's intent to further the interests of finality, comity, and federalism.[3] *Williams v. Taylor*, 529 U.S. 420, 436 (2000). Under 28 U.S.C. § 2254(e)(2), if a habeas petitioner "failed to develop" the factual basis for a constitutional claim in state court, the federal court cannot hold an evidentiary hearing unless the petitioner can show that one of two very narrow exceptions is applicable to his case.

---

[3] McKinney argues in his Reply that the Court should reconsider its decision that AEDPA applies to this case. (Docket No. 229, pp. 5-7.) Setting aside questions regarding the propriety of asking for reconsideration in this fashion, he has not provided the Court with any compelling reason to do so.

**Memorandum Decision and Order - 4**

The first question the federal court must ask is whether the facts were actually developed in state court, "a question susceptible, in the normal course, of a simple yes or no answer." *Williams*, 529 U.S. at 431.  If the answer is no, then the court must determine whether the petitioner or his counsel exhibited a "lack of diligence, or some greater fault." *Id.* at 432.  "Diligence for purposes of [§2254(e)(2)] depends upon whether the [petitioner] made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court," and it generally requires that the petitioner "seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 435, 437.  A finding that the petitioner lacked diligence in state court will preclude new evidentiary development in federal court. *Id.* at 435.

If the petitioner was unable to develop the facts despite a diligent attempt to do so, then he will be freed from the restrictions on new evidentiary development in § 2254(e)(2), and the decision whether to convene a federal evidentiary hearing reverts to the district court's discretion. *Schriro v. Landrigan*, 127 S.Ct. 1933, 1937, 1940 (2007).  The court should exercise that discretion in the petitioner's favor when (1) he did not receive a full and fair hearing in state court *and* (2) he has alleged specific facts that, if proven to be true, would entitle him to habeas relief. *Landrigan*, 127 S.Ct. at 1940;  *Karis v. Calderon*, 283 F.3d 1117, 1126-27

**Memorandum Decision and Order - 5**

(9th Cir. 2002).  The court must still take into account whether the petitioner would prevail under AEDPA's deferential standard of review on the merits under 28 U.S.C. § 2254(d).  *Landrigan*, 127 S.Ct. at 1940.  A hearing will not be necessary when the record "refutes the [petitioner's] factual allegations or otherwise precludes habeas relief."  *Id*. at 1940 (citing *Totten v. Merkle*, 137 F.3d 1172, 1176 (1998)); *see also Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir. 1992).

With these standards in mind, the Court now turns to the specific claims in this case.

Discussion

1.      Ineffective Assistance of Counsel:  Claims 1(a)(d)(f)

McKinney seeks to present evidence in support of his claim that his trial counsel was constitutionally ineffective because counsel (1) failed to object to the jury handling the murder weapon during trial, (2) failed to correct misinformation in the PSI regarding an incident in Bullhead City, Arizona, and (3) failed to present mitigating evidence regarding childhood physical, sexual, and drug abuse.  (Docket No. 203-1, pp. 7-10.)

McKinney had a full and fair opportunity to develop the facts during his first post-conviction proceeding, and he took advantage of that opportunity.  He was appointed new counsel for the post-conviction matter, who conducted an

independent investigation and who filed affidavits in support of the petition. The trial court held an evidentiary hearing, at which post-conviction counsel presented extensive testimony related to the mitigating evidence that trial counsel, William Carlson, allegedly failed to uncover.  (State's Lodging D-23.)  He also elicited testimony regarding the supposedly true facts related to McKinney's role in a fight in Bullhead City.  Carlson was called as a witness and testified about his handling of these particular matters.  (State's Lodging D-23, pp. 84-95.)  McKinney testified about his family background and about the Bullhead City incident.  (State's Lodging D-23, pp. 96-135.)

After considering the entire record, the state district court denied relief. (State's Lodging D-22, p. 181.)  In its ruling, the court accepted "as true" McKinney's factual allegations related to his family background and the Bullhead City incident, but it concluded that these facts would not entitle him to relief as a matter of law.  (State's Lodging D-22, p. 175, 177.)  Regarding the claim that trial counsel was ineffective in not objecting to the jury handling the murder weapon, the court determined that no prejudice had been shown.  (State's Lodging D-22, p. 173.)  On appeal, the Idaho Supreme Court concurred with the lower court's reasoning.  *McKinney II*, 772 P.2d at 1222.

As result of this full post-conviction proceeding, the facts have been

developed in this record.  To the extent that McKinney contends that *additional*

facts were not presented in state court, the failure to do so is attributable to him.

*See Williams*, 529 U.S. at 432.  His argument that post-conviction counsel was

inexperienced and lacked sufficient resources is vague, fails to address the United

States Supreme Court's conclusion in *Williams* that fault may properly be

attributable to the "the prisoner or the prisoner's counsel," *see Id*. at 432, and, at

any rate, is a species of the same argument that this Court has previously rejected.

(Docket No. 166, pp. 29-32.)

Accordingly, McKinney must now show that he is entitled to habeas relief

based on the record that was before the state courts.  *Holland v. Jackson*, 542 U.S.

649, 652-53 (2004).

2.    Use of Dovey Small's Deposition Testimony: Claim 5

At the time of his trial, McKinney's accomplice in these crimes, Dovey

Small, was eight months pregnant with their child.  The trial court noted that it had

been informed that Small "was in the hospital, and [doctors] were treating her for

fear she would have a miscarriage."  (State's Lodging B-12, p. 1199.)  Based on

this information, the court found that Small was unavailable to testify, and it

allowed the prosecution to read selected portions of her deposition testimony into

evidence.  (State's Lodging B-12, p. 1199.)

**Memorandum Decision and Order - 8**

McKinney alleges that the introduction of the deposition testimony violated his constitutional right to confrontation and to a reliable capital sentencing hearing. (Docket No. 203-2, p. 11.)  He seeks an evidentiary hearing on this claim, and his current habeas counsel asserts that she can present evidence that Small was available to testify.  (Docket No. 230, ¶ 3(s).)  The time to present this evidence was before the state trial court made its initial ruling, or perhaps even as late as the initial post-conviction proceeding when other claims related to Small's deposition testimony had been raised.  (State's Lodging D-22, p. 32, 41.)  McKinney's failure to develop the additional facts at the appropriate time is attributable to him or his counsel, and § 2254(e)(2) prohibits an evidentiary hearing in federal court.

      3.    <u>Handcuffing in the Presence of the Jury: Claim 12</u>

Midway through the trial, defense counsel requested a mistrial, arguing that his client had been transported to and from the courtroom in handcuffs, possibly in the presence of the jurors.  (State's Lodging B-11, p. 1071.)  In support, he testified under oath that he had personally observed the county sheriff bring McKinney into the courtroom in handcuffs and that he had also seen the sheriff handcuffing McKinney before the jurors had left the courtroom during recesses.  (State's Lodging, B-11, p. 1073.)  He could not "represent or testify . . . that [he] saw a particular juror actually observing that.  Only that they were still passing from the

courtroom." (State's Lodging B-11, p. 1077.)

The trial court denied the motion, finding that McKinney was not shackled when he sat at counsel's table during testimony and that there was no "prejudice to the defendant in this trial by being brought to the area of the courtroom in cuffs and having them taken off. There's no great display of him being in cuffs." (State's Lodging B-11, 1076.) The Idaho Supreme Court affirmed. *McKinney I*, 687 P.2d at 575.

As with the last claim, the appropriate time to present all material facts related to this issue was when the trial court was considering the motion for mistrial, not many years later in a federal habeas proceeding. (State's Lodging B-11, p. 1071.) McKinney's lack of diligence precludes new evidentiary development.

### 4.     Disproportionate Sentencing:  Claim 13

McKinney next contends that he is entitled to an evidentiary hearing on his claim that his Eighth and Fourteenth Amendment rights were violated because his death sentence is disproportionate to Dovey Small's life sentence and is disproportionate to other similarly situated defendants, particularly defendants in the same judicial district.

On appeal, the Idaho Supreme Court noted that it "had reviewed other cases

involving the death penalty" and it had determined that "the sentence in the instant case is not excessive or disproportionate." *McKinney I*, 687 P.2d at 576.  The facts and circumstances in McKinney's and Small's cases are contained in the record, and, in the post-conviction appeal, McKinney proffered to the Idaho Supreme Court other specific cases from the same judicial district.  (State's Lodging E-26, pp. 25-29.)  This claim can be resolved on the existing record.

     5.    <u>Unreasonable Delay in the State Courts: Claim 35</u>

In Claim 35, McKinney alleges that the state courts have unreasonably delayed the adjudication of his constitutional issues, resulting in an excessively prolonged incarceration under a death sentence and violating his Eighth Amendment right to be free from cruel and unusual punishment.  There is no need for an evidentiary hearing, as this claim fails as a matter of law.

The United States Supreme Court has never held that an extensive delay between the pronouncement of a death sentence and execution can amount to cruel and unusual punishment, though two current justices have indicated that the issue may be worth examination by the full Court.  *See Lackey v. Texas*, 514 U.S. 1045 (1995) (Stevens, J. & Breyer, J., respecting the denial of certiorari);  *Knight v. Florida*, 528 U.S. 990, 993-94 (1999) (Breyer, J., dissenting from denial of certiorari); *Foster v. Florida*, 537 U.S. 990, 993 (2002) (Breyer, J., dissenting from

**Memorandum Decision and Order - 11**

denial of certiorari).  In contrast, Justice Thomas has noted that he is "unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed." *Knight*, 528 U.S. at 990 (Thomas, J., concurring in the denial of certiorari).  Circuit courts, including the Ninth Circuit, have determined that prolonged incarceration under a sentence of death does not offend the Eighth Amendment.  *See McKenzie v. Day*, 57 F.3d 1493, 1493-94 (9th Cir. 1995) (en banc); *Allen v. Ornoski*, 435 F.3d 946, 958-60 (9th Cir. 2006) (examining cases); *White v. Johnson*, 79 F.3d 432, 438 (5th Cir. 1996) (delay of 17 years); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir. 1995) (delay of 15 years); *Chambers v. Bowersox,* 157 F.3d 560, 568, 570 (8th Cir. 1998)*; Free v. Peters*, 50 F.3d 1362, 1362 (7th Cir. 1995) (per curiam).

McKinney is seeking the announcement of a new rule of constitutional law in this habeas proceeding, which is barred by the non-retroactivity principles set forth in *Teague v. Lane*, 489 U.S. 288 (1989).  *See, e.g., White v. Johnson*, 79 F.3d 432, 437-38 (5th Cir. 1996) (finding a similar "*Lackey* claim" to be *Teague*-barred).  More important, without any authority in his favor, let alone Supreme Court precedent, McKinney simply cannot show that the state court's decision to deny relief on the merits was "contrary to, or involved an unreasonable application

of, clearly established Federal law as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); *Allen v. Ornoski*, 435 F.3d 946, 958-60 (9th Cir. 2006).  Claim 35 will be dismissed.

> 6.      Prosecutorial Misconduct and *Brady* Violations: Claims 7 and 36

In these two claims, McKinney alleges that the prosecutors committed misconduct and failed to disclose of all exculpatory evidence to the defense as required by *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.

In Claim 7, McKinney lists ten specific items that he believes constitute *Brady* material.  The Court previously determined that this claim was procedurally defaulted, but it reserved its final decision whether to dismiss the claim.  (Docket No. 166, pp. 32-33.)

In Claim 36, McKinney contends that the prosecutors also engaged in "gross misconduct" by "tightening" the cylinder on the murder weapon to increase the weight of the trigger pull, thereby negating his testimony that the gun accidently discharged.  He further contends that the prosecutors committed a *Brady* violation by not disclosing the "true state of the condition of the firearm."  (Docket No. 201, p. 3-8.)  These new allegations were the subject of McKinney's most recent appeal in the Idaho Supreme Court, which that court rejected on three alternative grounds, one of which was that the issues were untimely under Idaho Code § 19-2719(5).

*McKinney IV,* 150 P.3d at 286.  This Court has already determined that Idaho Code §19-2719(5) is an independent and adequate state law ground.  Therefore, like Claim 7, the new misconduct/*Brady* claim is procedurally defaulted.

McKinney asserts that he is entitled to evidentiary hearing to prove cause and prejudice as means of avoiding the dismissal of these claims.  Because the cause and prejudice analysis for a defaulted *Brady* claim so closely tracks the elements of such a claim on the merits, *see Strickler v. Greene*, 527 U.S. 263, 281-82 (1999), the Court finds that the most efficient manner in which to address these issues is to move directly to whether McKinney has alleged specific facts that, if true, would entitle him to relief on the merits.  The Court concludes that he has not.

<u>Legal Standards</u>

A criminal defendant's constitutional right to a fair trial under the Sixth and Fourteenth Amendments is violated when a prosecutor has engaged in misconduct that "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  More pertinent here, a prosecutor cannot knowingly present false evidence, or fail to correct false evidence, to secure a conviction.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006).   If there is any reasonable likelihood that false testimony affected the judgment of the jury, then

**Memorandum Decision and Order - 14**

the defendant has established a due process violation.  *Hovey*, 458 F.3d at 916.

Even without intentional misconduct, it is still a violation of due process when the prosecution withholds exculpatory evidence from the defense that is material to guilt or punishment.  *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Bagley*, 473 U.S. 667, 676 (1985).  A meritorious *Brady* claim contains three essential components: (1) the evidence must be favorable to the accused, either because it is exculpatory or impeaching; (2) the prosecution must have withheld the evidence, either intentionally or inadvertently; and (3) the evidence must be material to guilt or punishment.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Evidence is material when there is a reasonable probability that the outcome would have been different had the evidence been disclosed.  *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995); *Bagley*, 473 U.S. at 676.  In assessing materiality under *Brady*, the court should review the "tendency and force" of each item individually, but all exculpatory evidence that the prosecution has withheld must then be accumulated to determine the net effect on the defendant's right to a fair trial. *Kyles*, 514 U.S. at 436-37; *Barker v. Fleming*, 423 F.3d 1085, 1096 (9th Cir. 2005) ("[w]e examine the withheld evidence individually and cumulatively").

The Court will first address McKinney's claim that the prosecutors tampered

with critical evidence and concealed that fact from the defense before turning to the additional *Brady* allegations.

Alleged Alteration of the Murder Weapon

McKinney testified at his trial that he accidently shot Robert Bishop, Jr., once in the stomach after Bishop had set up some bottles for target practice. (State's Lodging B-12, pp. 1372-73.)  Panicked, he then got into Bishop's car and drove several miles to a local bar to retrieve Dovey Small, and her sister, Ada Mangum.  (State's Lodging B-12, pp. 1372-73.)  They returned to the scene, where Small inexplicably grabbed the gun, walked over to Bishop as he was lying on the ground, and shot him several times.  (State's Lodging B-12, pp. 1374-78.)

After the defense rested, the State presented rebuttal evidence from its firearms expert, Richard Craven.  Craven testified that he had weighed the trigger pull on the murder weapon earlier that morning and that the weight of each cylinder averaged 21 pounds when the hammer is not cocked, which was one of the heaviest that he had ever encountered.  (State's Lodging B-13, p. 1575.)  He further claimed that the heaviness of the trigger pull had not changed from the time that he first received the weapon.  (State's Lodging B-13, pp. 1572-73, 1575.) If credited, Craven's testimony about the weight of the trigger pull would have made McKinney's defense of an accidental shooting much less likely.

**Memorandum Decision and Order - 16**

Nearly twenty years later, habeas counsel obtained a short handwritten note in one of the prosecutor's files during court-authorized discovery in this matter. That note reads as follows:

> <u>Prepare</u>:
>
> -Trigger Pull Examination
>
> -Handwriting
>
> -Dr. Garrison
>
> -*Tighten gun cylinder*
>
> -Ask Darrel for transcript of McKinney Testimony

(State's Lodging J-59, Exhibit C.) (Emphasis added.)

The Court allowed McKinney to depose the trial prosecutors regarding the withholding of any exculpatory evidence. Former prosecutor Michael Kennedy admitted that he authored the "Prepare" note during McKinney's trial, but he could not recall why he wrote "tighten gun cylinder," and he explained that he did not have the expertise to do so. (State's Lodging J-59, Appendix E, "Kennedy Depo.," p. 42.) In a separate deposition, trial prosecutor Tom Moss testified that he had no knowledge of the note and no recollection of discussing "the need to have the gun cylinder tightened," and he was "sure we would not have tightened the gun cylinder." (State's Lodging J-59, Appendix E, p. 26.) The murder weapon

can no longer be located.

McKinney now alleges that one or both of the prosecutors physically tampered with the weapon to increase the weight of the trigger pull, and that they compounded this misconduct by not disclosing the "true condition" of the firearm to the defense.  He appears to rely on a mixture of legal principles derived from *Donnelly*, *Napue*, and *Brady* to argue that his right to a fair trial was violated, and he seeks an evidentiary hearing to show cause and prejudice or to adduce evidence on the merits.  That request will be denied.

This Court concurs with the Idaho Supreme Court that McKinney has not come forward with any specific facts or evidence tending to show that the prosecutors actually altered the murder weapon, knowingly presented false evidence, or concealed exculpatory evidence regarding the firearm from the defense.  *See McKinney IV*, 150 P.3d at 285 ("there is no evidence of prosecutorial misconduct").  Distilled to its essence, he has pinned this claim almost entirely on an ambiguous phrase in a twenty-five-year-old handwritten note, and he fills the evidentiary gaps with unsupported speculations and assumptions.  This is not a colorable claim for relief that requires an evidentiary hearing.

First, McKinney places far too much weight on the note itself, which is subject to a number of interpretations, the majority of which are benign.  In his

deposition, Kennedy said that he had no expertise in altering the cylinder of a firearm and that he did not "even know how you do that." (Kennedy Depo., pp. 42-43.) McKinney has come forward with no evidence to the contrary, and it is likely, as Kennedy testified, that "some witness must have said something or Richard Craven must have said something," causing him to write down the phrase. (Kennedy Depo. pp. 42-43.) An attorney's notes jotted down in the heat of trial are far from models of clarity, and perhaps the least probable scenario is that Kennedy memorialized his intent to alter a crucial piece of evidence in the midst of a capital murder prosecution on the same page that he recorded other innocuous tasks that needed to be completed.

Indeed, it is still not even clear how one "tightens" the cylinder on a revolver like the one used in this case. While McKinney has offered the declaration of a firearms expert who opines that "to tighten the cylinder of the gun would definitely increase the trigger pull for the double action cycle," he does not elaborate on precisely how one would go about doing so, or whether the "tightening" process could be accomplished easily by a lay person. (Docket No. 123, ¶ 9.)

Furthermore, because McKinney suggests that the weapon was probably altered *after* his defense was revealed at trial, *see* Docket No. 201, pp. 5-6, it logically follows that a necessary player in this conspiracy must have been Richard

**Memorandum Decision and Order - 19**

Craven.  This is so because Craven stated during his rebuttal testimony that the action of the trigger was the same when he tested it that morning *as when he first received it before trial*.  (State's Lodging B-13, pp. 1372-73, 1575.)  He also testified that "there are no indications of tampering whatsoever."  (State's Lodging B-13, p. 1575.)  Unless the cylinder was tightened before the weapon arrived at Craven's lab, then for McKinney's theory to be valid, Craven must have committed perjury when he testified that the gun's action had not changed in the interim.  Yet McKinney has failed to point to any evidence that Craven participated in the alleged misconduct or a subsequent cover-up in any way.

McKinney suggests that if the claim is missing a few component parts, this is exactly why an evidentiary hearing should be held.  He asserts that no prosecutor would admit during a deposition that he or she had altered critical evidence.  (Docket No. 203-1, p. 26.)  He also implies that an agent of the State has since lost, destroyed, or stolen the murder weapon, perhaps to conceal a conspiracy.  (Docket No. 229, p. 16.)  Federal habeas counsel proffers that she can establish the following: Tom Moss checked the handgun out of evidence for a day (presumably to allow Craven to conduct his test before he testified on rebuttal); the handgun was transported from county to county and case to case; weapons from various cases were discovered in the court reporter's office after he died; and the former

prosecuting attorney of Bonneville County, Kimball Mason, has since been

convicted of stealing guns from evidence and lied about whether he had knowledge

of this case.  (Docket No. 230, ¶ 3(c)-(e).)

      If McKinney could prove these facts, they still would not show that Tom

Moss, Michael Kennedy, Kimball Mason, the court reporter, or any other state

official disposed of this handgun to conceal evidence of tampering.  Mason's

recent conviction for stealing weapons in other cases, while troubling, is not tied to

this case beyond a bare assertion that he had notice of the County Clerk's intention

to destroy the gun and that he issued a "false denial" about his knowledge of the

case.  (Docket No. 230, ¶ 3(c)-(e).)  If the handgun could be found and inspected, it

may or may not provide the most probative evidence on this issue, but it is not

entirely surprising that it has come up missing after more than twenty years, two

jury trials (one for each co-defendant), many post-conviction proceedings, and

several appeals.

      In short, McKinney relies primarily on conjecture rather than specific facts

that can be proven by evidence, and the Court need not grant an evidentiary

hearing request based on conclusory allegations in the absence of any proof or an

offer of proof that would show a constitutional violation.  *Coleman v. McCormick*,

874 F.2d 1280, 1284-85 (9th Cir. 1989).  More to the point, he has not persuaded

the Court that more favorable evidence would be forthcoming if an evidentiary

hearing were convened.  *See Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir.

1999) (noting that a petitioner is not entitled to discovery or an evidentiary hearing

to "explore [his] case in search of its existence"); *see also Abut v. State of Maine*,

431 F.2d 688, 689 (1st Cir. 1970).

Based on the foregoing, Claim 36 will be dismissed without further

proceedings.[4]

## Other Alleged *Brady* Violations:  Claim 7

McKinney lists ten additional items of potential evidentiary value that he

argues were exculpatory and not turned over to the defense.  Many of these items

are not *Brady* material because they are inadmissible, unreliable, or potentially

inculpatory.  For the few items that may not have been disclosed and could have

been favorable to the defense in some limited fashion, McKinney has failed to

establish prejudice.

### *Lacy Small's Statements*

---

[4] Dismissal of this claim is not premature, as McKinney seems to suggest.  McKinney has previously been permitted to engage in discovery, and he has amended his Petition three times.  The parties have fully briefed procedural default matters, the Court has issued its decision, and the parties have also discussed the amended claims at length in their briefing on whether an evidentiary hearing is necessary.  Although Respondent has not filed a formal answer to the recent amendments, his position on this matter is clear.  There is no indication that the evidence will get any better for McKinney on this claim if he were provided additional evidentiary development.  Therefore, it is in the interests of judicial efficiency and finality to resolve the issue now.

McKinney first asserts that the prosecution did not disclose "a memorandum revealing that Lacy Small (brother of co-defendant, Dovey Small) had told a person by the name of Jeff Smith that 'she shot him.'"  (Docket No. 29, p. 25.)  The "memorandum" is actually a short telephone message for prosecutor Tom Moss to call an individual named Stu Lund.  (State's Lodging F-31, p. 342.) This document contains inadmissible multiple hearsay filtered through various sources whose reliability and credibility are entirely unknown.  In its current form, the exculpatory and impeachment value of this evidence is non-existent.

In  a related vein, McKinney asserts that Lacy Small wrote a handwritten letter suggesting that the police were pressuring him to say that as McKinney was arrested he blurted out that he was "going for murder," when he had not in fact said that, and that Casey Wheeless (a key State's witness) had been paid for his testimony.  McKinney has not proffered any additional evidence from Small or any other individual that could provide the necessary foundation and context for the letter, let alone independently corroborate Small's statements.  A meritorious *Brady* claim cannot be built upon a petitioner's unsupported conjecture that the disclosure of inadmissible information might have led to admissible exculpatory or impeachment material.  *See Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (finding no *Brady* violation based upon speculation that the disclosure of polygraph results

would have led to exculpatory and admissible evidence); *see also Barker v. Fleming*, 423 F.3d 1085, 1099 (9th Cir. 2005) (dismissing a petitioner's theory of a *Brady* violation as "mere speculation").

### *Garth Hadley's Letter*

McKinney next alleges that an inmate named Garth Hadley wrote a letter to him indicating that he (Hadley) had  "material information" regarding the relationship between Casey Wheeless and the victim's father, Robert Bishop, Sr. McKinney asserts that the State intercepted this letter before it reached him.

The "material information" that Hadley secretly harbored remains a mystery, though McKinney implies that Bishop paid Casey Wheeless for his testimony. Again, McKinney has failed to demonstrate that this vague evidence would have been admissible at trial or sentencing, or that its disclosure could have reasonably led to the development of other exculpatory or impeachment evidence.  *See United States v. Kennedy*, 890 F.2d 1056, 1059 (9th Cir. 1989) ("[t]o be material under *Brady*, undisclosed information or evidence acquired through that information must be admissible"); *cf. Paradis v. Arave*, 240 F.3d 1169, 1178-79 (9th Cir. 2001) (recognizing that other cases have held that the undisclosed item must have itself been admissible or served as impeachment material).

Moreover, McKinney has not come forward with any independent and

reliable evidence supporting his theory that Wheeless was paid for his testimony. At Dovey Small's trial, Robert Bishop, Sr., was asked directly about this matter, and he denied offering any kind of reward or paying anyone for his or her testimony.  (State's Lodging G-41, pp. 832-33.)  Without evidence to the contrary, "[t]he most [McKinney] can offer is a theory woven largely of threads he has created himself to link pieces of evidence."  *Barker v. Fleming*, 423 F.3d 1085, 1099 (9th Cir. 2005).

### *Birdie Peabody's Statement*

Birdie Peabody was a desk clerk at the motel in which Dovey Small and Randy McKinney stayed when they first entered Idaho.  At Small's trial, which occurred after McKinney's, Peabody was called as a witness for the State.  She testified that she overheard Small, speaking to her sister on the telephone, say, "he better not, or I'll kill him."  (State's Lodging G-39, pp. 90-91.)

The extent to which this evidence would have been favorable to McKinney at his own trial is minimal.  It is unclear about whom Small was referring when she said she would kill "him."  Further, the statement in no way conflicts with the State's theory at McKinney's trial that Small and McKinney jointly conspired and planned Bishop's murder.

Regardless, the Court finds that the evidence is not material, and its alleged

non-disclosure was not prejudicial, as discussed at the conclusion of this section.

### *Robert Anderson's Statement*

One aspect of the State's case against McKinney was presented through the testimony of another of Dovey Small's sister, Cathy Mangum.  Cathy testified that the day before Bishop was murdered, she, Ada Mangum, and a person named Robert Anderson drove to Malad, Idaho, in Anderson's car to retrieve Small and McKinney.  Cathy claim that when they arrived, McKinney displayed a handgun to them and declared that he was "going big time, no more penny ante."  (State's Lodging B-10, pp. 705-07.)   She further claimed that McKinney later said he would "blow [Robert Bishop] away."  (State's Lodging B–10, p. 714.)

At Small's trial, Robert Anderson testified that he never heard McKinney say anything about "going big time."  (State's Lodging G-42, p. 1215-16.)  As potential impeachment material for Cathy's testimony, the prosecution had a duty under *Brady* to disclose Anderson's statement to the defense.  Even if the State withheld this evidence, though, McKinney cannot show materiality and prejudice, as discussed below.

### *Possession of Drugs*

McKinney next contends that the prosecution failed to disclose that police officers had confiscated drugs from him when he was arrested and that a report had

been generated analyzing those drugs.  He argues that this information would have supported a defense of voluntary intoxication or provided mitigating evidence at sentencing.

McKinney should have known of these particular facts before his trial because the drugs were taken directly from him.  When a defendant is already aware of the salient facts that comprise the allegedly exculpatory evidence, the prosecution cannot be said to have committed a *Brady* violation.  *See Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (finding no *Brady* violation for failure to disclose medical records when the defendant was aware that he was being treated by medical personnel at the jail); *see  also Lambert v. Blackwell*, 387 F.3d 210, 265 (3d Cir. 2005); *Spirko v. Mitchell*, 368 F.3d 603, 611 (6th Cir. 2004).

Additionally, evidence of McKinney's alcohol and drug use was already in front of the jury and was offered by his counsel to the judge as a mitigating factor at sentencing.  More evidence in that regard would have been cumulative and immaterial for *Brady* purposes.

### *Bishop's "Flirtation" with Dovey Small*

For his next item, McKinney relies on Dovey Small's statement to her attorney, Marlene Fleming, in which she said that Robert Bishop, Jr., was "flirting with [her] all day."  (State's Lodging F-31, pp. 351-52.)  Fleming recorded these

**Memorandum Decision and Order - 27**

comments in her own notes, which the prosecution obtained before McKinney's trial.  (State's Lodging F-31, pp. 352-53, 502.)  McKinney now contends that the statement could have supported a voluntary manslaughter defense or might have been used in mitigation of punishment.

As with much of the evidence that McKinney alleges contains *Brady* material, Fleming's notes are double hearsay.  He has failed to explain how the information would have been admissible at his trial or at the sentencing proceeding, or how its disclosure would have led to admissible evidence.

In any case, the "flirtation" evidence is not nearly as favorable to the defense as McKinney seems to believe, particularly without any other evidence that would tend to show that the murder was a spontaneous and immediate reaction to Bishop's supposed sexual advances.  McKinney precluded such a theory himself when he testified that he accidently shot Bishop once before Small killed him. Further, had he attempted to mount a heat of passion defense, the State could have reasonably countered that Bishop's overtures to Small, if they occurred, provided yet another motive for McKinney to kill him deliberately.

Therefore, this vague, inadmissible, and potentially inculpatory evidence is not *Brady* material.

### *Bullhead City*

**Memorandum Decision and Order - 28**

McKinney alleges that the State failed to disclose certain police reports showing that he was neither the aggressor nor that he displayed a gun during the incident at Bullhead City, Arizona.  Irrespective whether this evidence would have been favorable to McKinney for sentencing purposes or whether it was withheld from the defense, it was not material to the sentencing outcome, as discussed below.

### *County Jail Record*

The next item is a one-page booking sheet from the county jail showing that McKinney was placed on "suicide watch."  This unadorned notation, author unknown, shows only that McKinney may have been sufficiently distraught upon his arrest to alert the authorities to keep a close eye on him; without more, it does not prove that he had a "mental disorder," and it is neither exculpatory nor material to guilt or punishment.

### *Dovey Small's Reputation*

The final piece of McKinney's *Brady* claim is testimony that purportedly shows Small's "propensity toward violence and use and manipulation of males." (Docket No. 29, p. 26.)  McKinney appears to rely on witnesses from Small's trial who testified that her reputation in the community for honesty, truthfulness, and

integrity was bad.[5]   (State's Lodging G-43, pp. 1237-47.)  The Court need not

determine whether this evidence was withheld, as it is not material for the reasons

given in the next section.

Materiality

Favorable evidence is material, and its non-disclosure prejudicial, when it

"could reasonably be taken to put the whole case in such a different light as to

undermine confidence in the verdict." *Banks*, 540 U.S. at 698 (quoting *Kyles v.*

*Whitley*, 514 U.S. 419, 435 (1995)).  Under this standard, the court must

accumulate all withheld evidence that it has determined was favorable to the

accused to decide whether, had the evidence been disclosed, there is a reasonable

probability of a different outcome.  *Kyles*, 514 U.S. at 434.

 The Court will begin with a brief overview of the evidence that was

presented at trial.  The State's theory of this case was that McKinney and Small

jointly agreed to kill Bishop so that they could take his car and other personal items

to facilitate their travel out of state.  McKinney's guilt on this theory was amply

---

[5] He also alludes to information in the presentence investigation report in Small's case,
which initially included some specific instances of prior misconduct and conclusory statements
about her character, but much of that information was stricken from the record at Small's
sentencing hearing as second and third-hand hearsay.  (State's Lodging G-43, pp. 1340-41.)
McKinney has offered no argument as to how that information would have been admissible into
evidence at his trial or sentencing proceeding, or that how it could have reasonably led to
admissible and probative evidence.

**Memorandum Decision and Order - 30**

supported by the evidence:

- After a long haul on the road, McKinney and Small had very little money when they arrived in Idaho, and they were anxious to leave the state quickly so that Small would not be arrested on an outstanding warrant (from the testimony of several witnesses);

- Small was unsuccessful in obtaining money for a car that she had recently sold to an acquaintance (several witnesses);

- McKinney and Small discussed robbing and killing Bishop and disposing of his body in the desert so that they could steal his credit cards, take his car, and leave Idaho (testimony from Casey Wheeless, Denise Garner, and Tana Hampton);

- McKinney possessed the murder weapon before Bishop was killed, and he made statements about "going big time" and "blow[ing] him away" (Cathy Mangum);

- He left with Bishop to go target shooting, returned a brief time later in Bishop's car, telling Ada Mangum and Dovey Small that he shot Bishop "once in the stomach and five times in the head" (testimony from Dovey Small and Ada Mangum);

- He and Small intentionally took Bishop's car and his personal items, including his wallet, credit cards, and a jacket (testimony from various witnesses, including McKinney himself);

- When Small told him that he did not need to shoot Bishop, he responded that he had "proved his love for his woman" (Ada Mangum);

- McKinney gassed up the stolen car and forged Bishop's signature on a credit card receipt (Roger Aston);

- After being informed that the police had been told "the truth," McKinney said, "it looks like I'm going for murder" (Ada Mangum);

**Memorandum Decision and Order - 31**

- McKinney initially told police officers that he did not shoot anyone, which he later changed to an accidental shooting followed by amnesia, which he later changed at trial to an accidental shooting followed by Small firing the last shots;

- Bishop was shot once in the chest (a non fatal wound) followed by a series of execution-style shots to the head (pathologist);[6]

- The trigger pull of the weapon was heavy, rendering an accidental discharge unlikely (Richard Craven).

McKinney argues that the undisclosed evidence, taken together, makes his claim that Small killed Bishop without his knowledge or assistance much more likely, creating a reasonable probability of a different verdict and a different sentence.  The Court disagrees.

As an initial matter, although McKinney asks the Court to include the prosecutor's alleged failure to disclose the alteration of the murder weapon, the Court has already determined that this allegation is wholly speculative.  Similarly, the "memorandum" and letters allegedly containing Lacy Small's statements, the Garth Hadley letter, Marlene Fleming's notes about her conferences with Dovey Small, evidence of McKinney's drug possession at his arrest, and the "suicide

---

[6] At trial, the pathologist testified that the fatal gunshots to the head occurred anywhere from five minutes to one or two hours after the first shot to the chest.  McKinney relied on this testimony to argue that Small shot Bishop after he retrieved her and Ada from the bar, but the State contended that McKinney simply waited a period of time before delivering the final shots himself.

watch" notation on the jail record, are all so vague, insubstantial, and unreliable that McKinney has failed to show that their disclosure would have had any effect on guilt or punishment.  These matters will not be discussed further.  *See United States v. Sarno*, 73 F.3d 1470, 1506 (9th Cir. 1995) (finding no *Brady* violation from the failure to disclose evidence that was  "marginal, ambiguous, cumulative, inadmissible, unreliable, inculpatory, irrelevant, or of negligible probative worth").


Instead, the Court will focus its materiality analysis on the alleged non-disclosure of the statements of Birdie Peabody and Robert Anderson, evidence of Dovey Small's bad reputation, and reports of the Bullhead City incident.

### *Guilt Phase*

Birdie Peabody's statement that Dovey Small told someone over the telephone that "he better not or I'll kill him," does little to advance McKinney's cause.  This snippet of a one-sided conversation does not tend to prove that he had no advance knowledge of a plan to rob and kill Bishop or that Small fired the fatal bullets into Bishop's head.  Small's manipulative character was not a secret to the jury,  and she was not portrayed as a meek and innocent bystander in this affair. To the contrary, the prosecutor argued to the jury that she was an active participant in the criminal venture who "likes to get other people to do her dirty work."

**Memorandum Decision and Order - 33**

(State's Lodging B-13, p. 1690.)

This same analysis carries over to the evidence of Small's reputation in the community as a dishonest person.  To the extent that McKinney believes that character witnesses would have impeached her credibility, he does not account for Ada's testimony, which largely tracked Small's testimony regarding McKinney's actions around the time that Bishop was killed.  In other respects, Small's testimony was favorable to McKinney, such as her denial that they discussed the matter in the presence of Casey Wheeless or Denise Garner, her claim that Bishop was the one who suggested target shooting, and her denial that McKinney specified the number of times that he had shot Bishop.

Robert Anderson's statement that he never heard McKinney say something like, "this is big time, no more penny ante" may have contradicted Cathy Mangum's testimony, but she had already been significantly impeached.  On cross-examination, she admitted that Dovey Small had essentially raised her and that she often did what Small told her to do, and she conceded that she had lied under oath in a DUI proceeding in order to cover for Small.  (State's Lodging B-10, pp. 734-44.)  She further admitted that she took Bishop's jacket after the murder and had even asked for his wallet.  (State's Lodging B-10, p. 751.)  She was also impeached with her earlier inconsistent testimony in which she claimed that the

handgun that McKinney had brandished in the hours before the murder was an automatic, when the murder weapon was a revolver.  (State's Lodging B-10, p. 759.)  By the end of the trial, it was fairly clear that Cathy was biased and had shaped her testimony to the extent that she could to implicate McKinney and to distance Small from the murder.

Additionally, Cathy had nothing to offer about the critical discussion at the Wheeless home or about the events immediately before and after Bishop's murder. Even if Anderson's testimony had been presented at McKinney's trial, it would have held only minimal value to the defense.  *See Williams v. Woodford*, 384 F.3d 567, 598-99 (9th Cir. 2004) (holding that the failure to disclose cumulative impeachment evidence did not amount to a *Brady* violation because it would not have cast the witness in a significantly worse light).

The Court's confidence in the jury's verdict has not been undermined by the State's purported failure to disclose any of the above evidence.

### *Penalty Phase*

In imposing the death sentence, the trial court found one statutory aggravating circumstance beyond a reasonable doubt; specifically, that McKinney committed a murder during a robbery with the specific intent to cause the death of a human being.  (State's Lodging B-6, pp. 154-55.)  The court concluded that the

**Memorandum Decision and Order - 35**

mitigating evidence that McKinney had proffered was not substantial enough to justify a sentence less than death.  (State's Lodging B-6, pp. 154-55.)  The same judge also presided over Small's trial and sentenced her to life in prison, concluding that she was less culpable because the evidence was much stronger that McKinney had fired the fatal shots.

None of the allegedly undisclosed information would have placed the aggravation and mitigation case before the state court in such a different light that there is a reasonable probability that the death sentence would not have been imposed.  Dovey Small's statement that "he better not or I'll kill him," evidence of her bad reputation, and Robert Anderson's claim that he did not hear McKinney say "big time, no penny ante," would not weaken the evidence that tended to show McKinney's planning, complicity, and active involvement in the homicide.

The allegedly incorrect facts surrounding the Bullhead City incident had, at most, a minimal impact on the trial court.  The information in the presentence investigation report regarding that matter consisted of a few short lines, concluding with: "[t]here were, according to collateral contacts, guns drawn and pointed and threats made. The police were notified and responded to at least one of these altercations."  (P.S.R., p. 4.)

McKinney's participation in the altercation did not provide a factual basis

for the trial court's finding of the statutory aggravating circumstance, and the court did not otherwise emphasize the matter significantly.  Rather, the court first noted the incident during its general recitation of factual background:

> The defendant had confrontations with Dovey Small's former paramour in winning her over.  The confrontations, in Bullhead, Arizona, occurred approximately three months before the defendant came to Idaho and includes fights, drawn and pointed guns and threats.

(State's Lodging B-6, p. 10.)

The court next addressed the matter in relation to McKinney's argument that his lack of a violent background should be considered mitigating:

> It is urged that the defendant has not previously engaged in person or life threatening behavior.  Except for the present murder and report of threatening gunplay in the record this appears to be true.  However, standing as a bare assertion with the noted exceptions, the court finds nothing remarkable about this fact which entitles it to weight in mitigation.

(State's Lodging B-7, p. 152.)

This passage shows that the court considered the previous altercation to be somewhat of a minor episode that did not excessively stain McKinney's otherwise relatively non-violent record.  Given the isolated references in the court's findings, and when viewed in the context of those findings overall, there is no reasonable probability that had the facts been corrected to show that McKinney did not engage in "gunplay" during the altercation at Bullhead City, the result of the sentencing

**Memorandum Decision and Order - 37**

proceeding would have been different.

Because McKinney has not alleged facts that, if true, show that he would be entitled to relief under *Brady* or its progeny, there is no need for an evidentiary hearing.  Claim 7 shall be dismissed.

      7.    <u>Actual Innocence</u>

The final piece to McKinney's evidentiary hearing request is based on his claim of actual innocence, either as a reason to excuse other defaulted claims or as a freestanding basis for relief from his convictions and death sentence (Claim 37). He argues that he is innocent for the same reason that he offered at trial; that is, he accidently shot Bishop one time, retrieved Dovey Small and her sister from the bar, and Small then finished the matter without his prior knowledge or assistance. The Court previously decided that it would withhold its judgment on this issue until after all other non-defaulted habeas claims had been adjudicated, but because McKinney has pressed for an evidentiary hearing, and because the issue is without merit, the Court will address it now.

The United States Supreme Court has held that a procedural default may be excused in a federal habeas case if a petitioner can show that a fundamental miscarriage of justice will occur if his claims are not heard, which means that a non-harmless constitutional error has probably resulted in the conviction of

someone who is actually innocent.  *Murray v. Carrier*, 477 U.S. 478, 495-96

(1986).  To pass through this procedural gateway, the petitioner must come

forward with "new reliable evidence–whether it be exculpatory scientific evidence,

trustworthy eyewitness accounts, or critical physical evidence–that was not

presented at trial." *Schlup v. Delo*, 513 U.S. 298, 315, 324 (1995).  The petitioner

bears the burden of demonstrating that "in light of all the evidence, including

evidence not introduced at trial, it is more likely than not that no reasonable juror

would have found [him] guilty beyond a reasonable doubt." *Id.* at 327; *see also*

*House v. Bell*, 126 S.Ct. 2064, 2078 (2006).

A defaulted constitutional claim may also be heard in a capital habeas

proceeding when the petitioner can show that he is "innocent" of the death penalty,

even if he cannot show that he is innocent of the underlying offense.  *Sawyer v.*

*Whitley*, 505 U.S. 333, 340-41 (1992).  To prevail on such a claim, the petitioner

has a higher burden than the one set forth in *Schlup*; here, he must show by clear

and convincing evidence that but for constitutional error, no reasonable finder of

fact would have found him eligible for the death penalty under state law.  *Id.* at

348.

Despite recognizing these narrow exceptions to the procedural default

doctrine, the Supreme Court has never expressly held that a state prisoner's factual

innocence would provide an independent or freestanding basis for habeas relief, though a majority of the Court has assumed that the execution of an innocent person would be a constitutionally intolerable event. *Herrera v. Collins,* 506 U.S. 390, 417 (1993). The Ninth Circuit appears to have recognized such a freestanding claim, but it has also determined that a petitioner must meet an "extraordinarily high" burden to be entitled to relief, going beyond displaying doubt about his guilt and affirmatively showing, by "truly persuasive" evidence, that he is innocent. *See Carriger v. Stewart*, 132 F.3d 463, 476 (1997) (*citing Herrera,* 506 U.S. at 417).

Turning back to this case, the Court concludes that none of the material that McKinney has proffered amounts to compelling evidence of his actual innocence under any of these standards. (Docket No. 201, pp. 9-10; Docket No. 162, Exhibit 2.) This Court has already addressed why McKinney's claim that the prosecutors tampered with the murder weapon is not supported by the facts or the evidence, and it will not tread that ground again. The telephone message for Tom Moss that Lacy Small allegedly said "she shot him" contains third-hand information and is exceptionally vague. A former correctional officer's statement in an affidavit that Small has said that she "pulled the trigger" is hearsay, lacking in detail, and is contradictory to Small's other statements under oath. Likewise, Denise Garner's recent affidavit in which asserts that Ada Mangum told her, at some unknown time,

that Small shot Bishop is double hearsay.  Notably, Garner does not recant or contradict her trial testimony in which she claimed to overhear McKinney and Small discussing the murder and robbery before those crimes.

McKinney also points to Small's testimony at her own trial in which she claimed that she dropped the handgun after McKinney gave it to her because it was still hot.  The Court does not necessarily agree that this is "a fact which was only consistent with Ms. Small having fired the weapon." (Docket No. 210, p. 10.)  In any case, regardless whether evidence could be unearthed that would be marginally probative of a claim that Small fired some or all of the shots, the other evidence that McKinney was at least a willing co-conspirator and aider and abettor in the robbery and murder was overwhelming and would stand undisturbed.

Finally, the Court need not speculate, as McKinney has admitted that he is not innocent.  During the first post-conviction proceeding he testified under oath that he killed Bishop:

> Q.    Randy, do you deny killing Robert Bishop?
>
> A.    No.  I'm not proud of it, but I don't deny it either.  It's something that shouldn't have happened.  Just because I don't break down and cry in front of everybody doesn't mean I don't feel remorse to what I've done.  But — I've cried several times in private.  You know?  I'm completely ashamed of what happened.  If giving my life would bring Robert back, I'd readily do it with no hesitation or reservation.  But it's not going to bring him back.

**Memorandum Decision and Order - 41**

(State's Lodging D-23, p. 110.)

Present counsel's interpretation of this exchange as "not an admission of guilt but an acceptance of responsibility for the events" strikes the Court as an exercise in semantics.  (Docket No. 229-1, p. 19.)  Post-conviction counsel specifically asked McKinney whether he denied "killing" Robert Bishop, and he responded "no."  The import of this language seems clear.  At any rate, he has "accepted responsibility" for the murder on many other occasions as well, including in a letter that he wrote to Small before his trial, which was presented to the jury (State's Lodging, B-12, pp. 1534-35), in a conversation that he had with Small's attorney after he was convicted, to the presentence investigator in anticipation of his sentencing (eventually stricken by the trial court), and under oath in an affidavit that was filed in Small's post-conviction proceeding.  (State's Lodging B-16, pp. 1-2; State's Lodging B-14, pp. 1784-85; State's Lodging H-44, pp. 73-74.)  Perhaps on some of these occasions he was attempting to minimize Small's role in an effort to protect her, but all of this evidence is directly contrary to his claim of an unfortunate mishap followed by Small coldly delivering the fatal gunshots without any planning, intent, knowledge, or assistance on his part.

A claim of actual innocence should not be a camouflaged attack on the sufficiency of the evidence presented at trial, perhaps dressed-up with bits and

pieces of new yet unreliable evidence.  Rather, to excuse the procedural default of other claims, the petitioner has a heavy burden to come forward with new evidence that is so compelling the district court must conclude either (1) it is more likely than not that no reasonable juror would find the petitioner guilty, or (2) the petitioner is clearly and convincingly innocent of the facts that made him eligible for the death penalty.  *Schlup*, 513 U.S. at 327; *Sawyer*, 505 U.S. at 340-41.  To prevail on a freestanding claim for relief, assuming one exists, the petitioner must affirmatively prove his innocence by "truly persuasive evidence."  *Carriger*, 132 F.3d at 476.  Because McKinney cannot meet any of these strict standards, he is not entitled to an evidentiary hearing.[7]  Claim 37 shall be dismissed.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Petitioner's Motion for Leave to Amend Petition for Writ of Habeas Corpus (Docket No. 201) is GRANTED.  Petitioner shall forthwith electronically file the Third Amended Petition for Writ of Habeas Corpus that he previously submitted to the Court via email on January 9, 2007.

---

[7] McKinney's contention in his Reply that his robbery and murder convictions merged with the conspiracy charge (Docket No. 229, p. 21) appears to be an improper attempt to raise an entirely new claim in a reply brief.  It is also an argument regarding legal insufficiency, rather than factual innocence.  *See Bousley v. United States*, 523 U.S. 614, 623 (1998).

**Memorandum Decision and Order - 43**

IT IS FURTHER ORDERED that Petitioner's Motion for an Evidentiary Hearing (Docket No. 203) is DENIED.

IT IS FURTHER ORDERED that the claims that the Court has found to be procedurally defaulted in this matter shall now be DISMISSED with prejudice, including: Claims 1(b)(c)(e)(g)-(p), 2, 4, 7, 8, 9, 17, 18 (as it relates to trial), 19, 20, 21, 22, 23, 24, 25 (trial claim), 26, 27, 28, 33, 34.

IT IS FURTHER ORDERED that Claims 35, 36, and 37 shall be dismissed for the reasons given in this Memorandum Decision.

IT IS FURTHER ORDERED that no later than October 8, 2007, Petitioner shall file a memorandum or brief containing points and authorities with respect to the remaining non-dismissed claims in this case.  Respondent shall submit a responsive memorandum or brief on or before November 6, 2007.  Petitioner's optional reply is due on or before November 26, 2007.

DATED:  **September 5, 2007**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision and Order - 44**