IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| RANDY LYN MCKINNEY, | ) | |
| | ) | |
| Petitioner, | ) | Case No. CV 96-0177-S-BLW |
| | ) | |
| v. | ) | **CAPITAL CASE** |
| | ) | |
| GREG FISHER, Warden, | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| Respondent. | ) | |
| _____ | ) | |

The Court previously dismissed several claims in this capital habeas corpus matter as procedurally defaulted and denied Petitioner's request for an evidentiary hearing.  (Docket Nos. 166, 237.)  Still pending from the Third Amended Petition are Claims 1(a)(d)(f), 3, 5, 6, 10-13, 14, 15, 16, 18(sentencing only), 25(sentencing), 29, and 30-32.

After considering the pleadings, record, briefing, and oral argument herein, the Court concludes that Petitioner is not entitled to relief on any claims related to the guilt phase of his state court criminal trial.  The Court further concludes, however, that Petitioner is entitled to relief on his claim that he was deprived of his

**MEMORANDUM DECISION AND ORDER - 1**

Sixth Amendment right to the effective assistance of counsel at his capital

sentencing proceeding.

Accordingly, the Third Amended Petition will be conditionally granted in

part and denied in part.  The Court shall issue the Writ with respect to Petitioner's

death sentence unless the State corrects the constitutional error by beginning a new

sentencing hearing, or by vacating the death sentence and imposing a lesser

sentence, within 180 days of the entry of judgment.  Given that such relief will be

granted, all other capital sentencing-related claims shall be dismissed as moot.

## FACTUAL BACKGROUND

After hitchhiking through several states and often relying on the kindness of

strangers for food and shelter, 19-year old Randy McKinney and his girlfriend

Dovey Small arrived in Malad, Idaho, on April 6, 1981, and checked into a motel

for the night.  (State's Lodging B-9, pp. 449-50.)  They intended to reunite with

Small's sisters, Ada Mangum and Cathy Mangum, both of whom lived in

Blackfoot, before traveling on to Montana.[1]  (*Id*. at 457.)  Small did not want to

stay in Idaho for any length of time because she was wanted on a felony warrant.

(*Id*. at 457.)

---

[1] To avoid confusion, in this section the Court shall refer to individuals who share the same last name only by their first names.

**MEMORANDUM DECISION AND ORDER - 2**

The next day Ada and Cathy recruited a friend to drive them to the motel to pick up Small and McKinney.  (State's Lodging B-9, p. 451-52.)  Once there, Small showed Ada a handgun that was laying on a table.  (*Id*. at 453, 531-32.)  According to Cathy, McKinney referred to this gun and said, "this is big time, no more penny ante." (State's Lodging B-10, p. 705. )

Later than same evening, Ada offered to call her friend Robert Bishop, Jr., to inquire whether he would drive Small and McKinney as far as the Interstate, where they could then hitchhike.  (State's Lodging B-9, p. 458.)  He called back the next morning and agreed.  (*Id*. at 458, 460.)  Cathy would later claim that while McKinney cleaned his gun and they waited for Bishop, he repeated that he was going "big time" and, also, that he was "going to blow him away."  (State's Lodging B-10, p. 711-14.)

When Bishop arrived, McKinney and Small loaded their personal belongings into car.  After dropping Cathy off, he drove Ada, Small, and McKinney to a convenience store to buy beer, cigarettes, and sodas, and it was decided at that time that they would take a route through Arco, Idaho, toward Montana.  (State's Lodging B-9, p. 550-51.)  Small suggested that she could get some traveling money in Arco from Jackie Wheeless, who supposedly still owed her money for a car.  (*Id*. at 550.)

**MEMORANDUM DECISION AND ORDER - 3**

After drinking more beer and playing games of pool at two bars in the Arco area, the group went to the home of Denise Garner, who lived with Jackie Wheeless' son, Casey. Small was also acquainted with Casey, a 17-year-old convicted felon who had already served time in prison, from her previous stay in Idaho when she had "hid [him] out from the law a couple of times." (State's Lodging B-11, p. 916.)

Casey agreed to show the group where his mother lived. Small and Ada rode with Casey in his car, while Bishop followed in his car with McKinney. On the way, Small told Casey that she and McKinney "had a piece," and that if Jackie's husband "gave her trouble ... she would blow his crap away." (State's Lodging B-11, p. 883). At one point, Small retrieved the gun from McKinney and fired a shot out of the window, aiming at an occupied house. (*Id*.) When they arrived at Jackie's house, McKinney took the gun from Small because he "didn't want her doing something stupid." (State's Lodging B-13, p. 1353.)

The ensuing discussion in the Wheeless home was heated, and Jackie refused to pay Small any money. (State's Lodging B-9, p. 471.) Empty-handed, the group decided to return to Casey and Denise Garner's home.

<u>The Conspiracy</u>

Casey would later testify that on the ride back, Small told him that she and

**MEMORANDUM DECISION AND ORDER - 4**

McKinney were going to kill Robert Bishop because he had a lot of money, credit cards, and a nice car.  (State's Lodging B-10, p. 912.)  He told her that the idea was stupid.[2]  (*Id*. at 913.)

Once at the house, Bishop sat on the couch in the living room and played with some children while McKinney and Small went into the kitchen and sat at a table.  (State's Lodging B-11, pp. 876-77, 914-15.)  Denise Garner was in and out of the kitchen, making a pot of coffee.  (*Id*.)  Casey stood nearby and overheard Small tell McKinney that they had to get out of the state, to which McKinney replied, "well, let's get the job done and get out of here."  (*Id*. at 915-16.)  Small then said, "Casey owes me one," and she pointedly asked him if he would kill Bishop.  (*Id*. at. 916.)  He refused, and McKinney said he would take Bishop out to the desert, shoot him, and then burn the body.  (*Id*. at 917.)  Small replied, "that sounds like a good idea."  (*Id*.)

Meanwhile, Ada called the owner of a local bar, the Antler Club, to tell him that they would arrive in a few minutes.  Casey and Denise did not accompany

---

[2]  Casey's claims regarding Small and McKinney's incriminating statements evolved over time.  He initially told law enforcement officers that Small and McKinney mentioned something about getting Bishop's credit cards.  The first time that he claimed on the record that they actually discussed killing Bishop was at a preliminary hearing several months later.

Regardless, the state courts have found that the incriminating discussions in fact occurred.  *See State v. McKinney*, 687 P.2d 570, 572 (Idaho 1984).  These findings are presumed to be correct.  28 U.S.C. § 2254(e)(1).

**MEMORANDUM DECISION AND ORDER - 5**

them.

The Robbery and Murder

Bishop drove the group to the Antler Club, and a suggestion was made that he and McKinney go target shooting with McKinney's gun.  (State's Lodging B-9, p. 473, State's Lodging B-12, p. 1258.)  Before they left to do so, McKinney had a brief conversation with Small at the rear of Bishop's car.  (*Id*. at 474.)  The men drove away, and the women went into the Club, ordered beers, and played pool. (*Id*. at 475.)

Approximately fifteen minutes later, McKinney returned and said, "let's go." (State's Lodging B-9, p. 477.)  When the women saw Bishop's car but noticed that he was absent, they asked McKinney where he was.  McKinney replied that he had "shot him once in the stomach and five times in the head."  (*Id*. at 478-79.)  They expressed disbelief, and he offered to show them the body.

McKinney drove them in Bishop's car to an old gravel pit outside of town, where they saw Bishop lying motionless on the ground.  (State's Lodging B-9, pp. 479-80.)  Ada became hysterical, and Small told McKinney that they should take her back to Blackfoot.  (*Id*. at 481.)  According to Ada, Small said, "you didn't have to shoot him," to which McKinney replied that he "had proved the love of his woman."  (*Id*. at 497.)

**MEMORANDUM DECISION AND ORDER - 6**

After depositing Ada at her house in Blackfoot, McKinney and Small proceeded on to Cathy's home, where Small told her that "Randy shot Bob." (State's Lodging B-10, p. 721.)  In response, Cathy asked for Bishop's leather jacket, supposedly as a keepsake to honor his  memory, which Small gave to her. (*Id.* at 722.)  Perhaps pushing her luck, Cathy also asked for his wallet, ostensibly as another keepsake, but that request was denied.  (*Id.* at 723.)

McKinney and Small drove to Pocatello, where McKinney forged Bishop's signature on a credit card receipt to pay for gas, but they soon called Ada to tell her that they would be coming back to Blackfoot to get Small's dog, which she had left behind.  (State's Lodging B-9, p. 510; State's Lodging B-10, pp. 608-09.)  Ada had already reported the shooting to her husband and his friends, and the police were called.

McKinney and Small were stopped by a police officer outside of Ada's home; McKinney immediately got out of the car on the passenger side and walked toward the officer.  (State's Lodging B-11, p. 1001.)  As the officer returned briefly to his patrol car, McKinney then walked into Ada's home.  (*Id.* at 1002.) Small had already disappeared, and she would later be found hiding in the bathroom.

McKinney asked Ada what she told the police, to which her husband

**MEMORANDUM DECISION AND ORDER - 7**

responded, "what the hell do you think she said? She told the truth." (State's Lodging B-9, p. 516.) McKinney said, "well, it looks like I'm going for murder." (*Id*.) At that point, police officers came into the home, and Ada declared to them that McKinney had shot Bishop; this time he said, "I didn't kill nobody." (*Id*. at 519.) Because the situation was becoming very tense, the officers took him into "protective custody." (State's Lodging B-11, p. 1006.) A quick search of the abandoned car revealed a .22 caliber handgun in a purse, in addition to Bishop's wallet. (State's Lodging B-11, p. 1023.)

Small and Ada both volunteered to take police officers to the gravel pit to show them Bishop's body, which was found to be lying in the same position as before. A pathologist would later determine that he had been shot once in the chest followed by four close-range shots to the head. (State's Lodging B-10, pp. 632, 637, 644.) Based on the amount of blood in his lungs, the shots to the head occurred anywhere from 5 to 10 minutes to one to two hours after the first shot to the chest. (State's Lodging B-11, pp. 1193.) Rifling on bullet fragments obtained during a subsequent autopsy was consistent with having been fired from the .22 caliber handgun that was found in the purse in Bishop's car. (*Id*. at 1173.)

McKinney was interviewed by officers later that same night. He initially denied having been to Arco, but then he started crying and claimed that he

**MEMORANDUM DECISION AND ORDER - 8**

accidently shot Bishop once while they were target shooting because Small's little dog was nipping at his heels.  (State's Lodging B-10, p. 807.)  He stated that he could not remember anything after that other than "going back to the bar to get the girls" and showing them Bishop's body.  (*Id.*)

<u>Trial, Sentencing, and Direct Appeal</u>

Based on these events, the State charged McKinney with murder in the first degree, robbery, conspiracy to commit murder, and conspiracy to commit robbery. (State's Lodging B-5, p. 2; State's Lodging B-6, pp. 6-8.)  The State did not charge Dovey Small initially, but she was nevertheless held in custody as a material witness until she agreed to be deposed in exchange for her release.  (State's Lodging B-8, pp. 10-20.)  Her deposition was taken in McKinney's presence and subject to his counsel's cross-examination. (State's Lodging B-15.)

By the start of McKinney's trial on November 2, 1981, Small had been charged with conspiracy and with aiding and abetting in robbery and murder. (State's Lodging B-6, pp. 6-8.)  She was also pregnant, and her trial was set to begin after McKinney's.  (State's Lodging G-37, p. 103.)  She did not testify at his trial, but the judge allowed portions of her deposition testimony to be read into evidence.  (State's Lodging B-12, pp. 1202-1266.)

McKinney testified in his own defense.  He again claimed that he accidently

**MEMORANDUM DECISION AND ORDER - 9**

shot Bishop because Small's little dog was nipping at his pant leg while Bishop was setting up bottles for target practice.  (State's Lodging B-12, pp. 1372-73.)  After Bishop fell, McKinney got into his car to the Antler Club to retrieve the women.  (*Id*. at 1372-73.)  For the first time, however, McKinney testified that after they returned to the scene, Small inexplicably grabbed the gun, walked over to Bishop as he was lying on the ground, and shot him several times in the head.  (*Id*. at 1374-78.)  McKinney denied any advance planning for the robbery and murder.  (*Id*. at 1359-60.)

In rebuttal, the State presented the testimony of firearms expert Richard Craven.  Craven testified that he had tested the weight of the trigger pull of the murder weapon, and it was one of the heaviest that he had ever encountered.  (State's Lodging B-13, p. 1575.)  The gun was then passed among the jurors so that they could test the gun's action for themselves.  (*Id*. at 1576.)

On November 12, the jury found McKinney guilty on all charges.  The trial court held an aggravation and mitigation hearing on March 5 and 9, 1982.  (State's Lodging B-14.)  At the hearing, defense counsel offered three witness in mitigation, two family members and a psychologist.  The family members testified that McKinney had been kind and gentle as a boy and that he had never been a leader.  (Id. at 1733-52.)  The psychologist testified that he was "impulsive" and

**MEMORANDUM DECISION AND ORDER - 10**

would not "inspire great confidence or certainty in a follower."  (*Id*. at 1763-67.)

On March 27, 1982, the trial court found one aggravating circumstance beyond a reasonable doubt, that the murder was committed in the course of a robbery with the specific intent to kill.  After weighing the proffered mitigation evidence  against that circumstance, the court sentenced McKinney to death. (State's Lodging B-6, pp. 156-57.)  The court also sentenced him to fixed life for robbery plus a consecutive 15 years for a firearms enhancement, an indeterminate 30 years for conspiracy to commit murder, and an indeterminate 30 years for conspiracy to commit robbery.  (*Id*. at 157-58.)  Dovey Small later received a fix life sentence for her part in Bishop's murder.

The Idaho Supreme Court affirmed McKinney's convictions and sentences on direct appeal.  *State v. McKinney*, 687 P.2d 570 (Idaho 1984) (*McKinney I*).

## STATE AND FEDERAL COURT COLLATERAL HISTORY

In 1984, McKinney filed his first state post-conviction action.  In one of his claims, he alleged that he had been deprived of his Sixth Amendment right to the effective assistance of counsel at his capital sentencing hearing because his counsel failed to investigate and uncover extensive evidence of childhood physical and sexual abuse.  (State's Lodging D-22, pp. 27-45.)  After conducting an evidentiary hearing, the district court denied relief, and that decision was affirmed on appeal.

**MEMORANDUM DECISION AND ORDER - 11**

*McKinney v. State*, 772 P.2d 1219 (Idaho 1989) (*McKinney II*).

McKinney filed his first Petition for Writ of Habeas Corpus in federal court in 1989, which was dismissed without prejudice in 1991 so that he could attempt to exhaust additional claims in a second state post-conviction action. *McKinney v. Paskett*, 89-CV-1182-S-HLR. In 1996, the state district court dismissed the second post-conviction petition, and McKinney appealed.

On April 23, 1997, while the state court matter was still pending, McKinney filed the current Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254, which he has now amended three times. Because the post-conviction matter was pending, this Court stayed the federal case until the state court appeal concluded. The Idaho Supreme Court issued its decision in 1999 affirming the district court, and the federal stay was lifted. *McKinney v. State*, 992 P.2d 144 (Idaho 1999) (*McKinney III*).

After staying the case a second time so that McKinney could raise claims in state court related to *Ring v. Arizona*, 536 U.S. 584 (2002), this Court addressed issues of procedural default, conditionally dismissing claims 1(b)(c)(e)(g)-(p), 2, 4, 7, 8, 9, 17, 18 (as it relates to trial), 19, 20-25 (trial claim only), 26-28, and 33-34. (Docket No. 166.)

In 2006, the Idaho Supreme Court denied relief in yet another post-

**MEMORANDUM DECISION AND ORDER - 12**

conviction appeal in *McKinney v. State*, 150 P.3d 283 (Idaho 2006) (*McKinney IV*).

On September 5, 2007, this Court denied McKinney's request for an evidentiary hearing and entered a final order dismissing with prejudice the procedurally defaulted claims. (Docket No. 237, p. 44.)  In that same Order, the Court also dismissed Claims 7, 35, 36, and 37, as matters of law and because McKinney had failed to allege facts that, if true, would entitle him to relief.  (*Id.*)  McKinney's recent request to expand the record with new evidence has likewise been denied, with one limited exception.  (Docket No. 288.)

The parties have submitted final briefing on non-dismissed Claims 1(a)(d)(f), 3, 5, 6, 10-13, 15, 16, 18 (sentencing), 25 (sentencing), and 30-32.[3] (Docket Nos. 247, 267, 277.)  The Court has heard oral argument on these matters, and being fully advised, is now prepared to issue its ruling.

## LEGAL FRAMEWORK FOR HABEAS REVIEW

The provisions of the Anti-terrorism and Effective Death Penalty Act (AEDPA) are applicable to this case.  (Docket No. 184.)  Under AEDPA, the Court cannot grant habeas relief on any federal claim that the state court adjudicated on the merits unless the adjudication of the claim:

---

[3] McKinney has affirmatively waived his request for relief on Claims 14 and 29. (Docket No. 247, p.2 n.1.)  The Court deems those claims withdrawn.

**MEMORANDUM DECISION AND ORDER - 13**

1.    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

Section 2254(d)(1) has two clauses, each with independent meaning.  For a decision to be "contrary to" clearly established federal law, the petitioner must establish that the state court applied "a rule of law different from the governing law set forth in United States Supreme Court precedent, or that the state court confronted a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrived at a result different from the Court's precedent."  *Williams v. Taylor*, 529 U.S. 362, 404-06 (2000).

To satisfy the "unreasonable application" clause, the petitioner must show that the state court was "unreasonable in applying the governing legal principle to the facts of the case."  *Williams*, 529 U.S. at 413.  A federal court cannot grant relief simply because it concludes in its independent judgment that the decision is incorrect or wrong; the state court's application of federal law must be objectively unreasonable.  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002).  The state court need not cite or even be aware of the controlling

**MEMORANDUM DECISION AND ORDER - 14**

United States Supreme Court decision to be entitled to AEDPA deference. *Early v. Packer*, 537 U.S. 3, 8 (2002).

To be eligible for relief under § 2254(d)(2), the petitioner must show that the decision was based upon factual determinations that were "unreasonable in light of the evidence presented in the State court proceeding." *Id*.

When the state court reaches a merits-based decision on a federal claim but fails to support its decision with reasoned analysis, AEDPA still mandates "an independent review of the record" to determine "whether the state court's decision was objectively reasonable." *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). But when the state court has not adjudicated a federal claim on the merits despite the petitioner's fair presentation of the claim, AEDPA deference to the legal conclusion is unwarranted and the federal court's review shall be *de novo*. *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

Under all circumstances, state court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

**MEMORANDUM DECISION AND ORDER - 15**

## GUILT PHASE CLAIMS

## Ineffective Assistance of Counsel (Claim 1(a))

After McKinney testified that he accidently shot Bishop once before Small delivered the fatal shots, the State presented rebuttal testimony Richard Craven. Craven testified that he had tested the weight of the trigger pull on the handgun, which previously been admitted as Exhibit H, and it was one of the heaviest that he had encountered.  At the close of Craven's direct examination, the prosecutor requested "that the firearm be passed among the jury so they can test the trigger pull themselves."  The trial court granted that request, and the gun was passed among the jurors.  (State's Lodging B-13, p. 1576.)

McKinney now contends that he was deprived of his Sixth Amendment right to the effective assistance of counsel because his trial counsel failed to object to this "jury experiment."  The Court disagrees.

1.    Standard of Review

The Idaho Supreme Court summarily rejected this claim during the initial post-conviction appeal without providing any reasoning supporting its decision. *McKinney II*, 772 P.2d at 1120-22.  Therefore, this Court must review the record to determine whether the state court's decision is "objectively unreasonable." *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

**MEMORANDUM DECISION AND ORDER - 16**

2.    <u>Clearly Established Federal Law</u>

The federal law governing ineffective assistance of counsel claims is derived from *Strickland v. Washington*, 466 U.S. 668 (1984).  To prove a violation of the Sixth Amendment, a petitioner must show both that his counsel's performance was unreasonably deficient and that the defense was prejudiced as a result.  *Strickland*, 466 U.S. at 687.

The standard for attorney performance in a criminal case is that of reasonably effective assistance, measured under prevailing professional norms. *Strickland*, 668 U.S. at 687-88.  In assessing whether the representation fell below an objective standard of reasonableness, counsel's conduct must be viewed under the facts that existed at the time that the challenged act or omission occurred, rather than through the benefit of hindsight.  *Id*. at 689.  The court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.  *Id*.

To prove prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id*. at 694.  A reasonable probability is one sufficient to undermine confidence in the result.  *Id*.

3.    <u>Discussion</u>

**MEMORANDUM DECISION AND ORDER - 17**

Although the Idaho Supreme Court did not articulate a basis for denying relief, this Court concludes that the state court's decision was not objectively unreasonable because McKinney cannot show that his counsel's performance was unreasonably deficient or that he was prejudiced.  In particular, he has not cited any rule or case law authority that would have supported a potentially meritorious objection to the jury's examination of the handgun.

By the time of the trial in this case, Idaho jurors had long been permitted to take into the jury room all exhibits "that have been received in evidence in the cause."  Idaho Code § 19-2203.  Nearly sixty years earlier, the Idaho Supreme Court had found nothing improper with a jury conducting simple tests on items that had been properly admitted.  *See State v. Foell*, 217 P. 608, 609 (Idaho 1923) (noting that the court "is not going to say that the jury cannot examine and make ordinary tests of an exhibit which the law permits them to take with them for examination").  This rule has apparently not changed.  *See State v. Fairchild*, 829 P.2d 550, 559 (Idaho Ct. App. 1992) (relying, in part, or *Foell* to reject an argument that jurors committed misconduct by inspecting bindles of methamphetamine).  Other courts addressing similar factual scenarios have likewise found no error.  *See Kurina v. Thieret*, 853 F.2d 1409, 1413-14 (7th Cir. 1988) (holding that "a simple experiment [in the jury room] based solely on

**MEMORANDUM DECISION AND ORDER - 18**

evidence introduced at trial was not prejudicial"); *United States v. Beach,* 296 F.2d 153, 158-59 (4th Cir. 1961) ("the mere making of a more critical examination of an exhibit than was made during the trial is not objectionable").

It is important to note that this case does not involve jurors conducting *out of court* experiments as a means of developing extrinsic evidence in the case; experimentation of that sort would likely be improper.  *See e.g. Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir. 1987).  Here, the jurors examined a properly admitted trial exhibit after a witness had testified about its unique properties.  Pulling a trigger requires no specific scientific expertise, and such an examination would be relevant given the evidence in the case.  Because McKinney has not shown that there would have had a sound basis for objecting, his counsel cannot be said to have been constitutionally ineffective.  *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (finding that the failure to lodge a futile objection is not ineffective assistance).

As a result, the Idaho Supreme Court's adjudication of this claim was not objectively unreasonable.  For the reasons given, McKinney would not be entitled to relief under even if the claim were reviewed under a *de novo* standard.

## Admission of Dovey Small's Deposition Testimony (Claim 5)

McKinney next contends that the admission of portions of Dovey Small's

pretrial deposition testimony violated his Sixth Amendment right to confront the witnesses against him.

In the absence of a state court decision on the merits of this constitutional claim, the Court must review the issue *de novo*.  Under that standard, the Court concludes that McKinney's right to confrontation was not violated because the State demonstrated that Small was unavailable due to complications from her pregnancy, and because her former testimony, which was taken under oath, in McKinney's presence, and subject to his cross-examination, bore adequate indicia of reliability to be admissible.  Alternatively, if a constitutional error occurred, the Court finds that it did not have a substantial and injurious effect or influence on the jury's verdict.

1.    Background

Small was not immediately charged with any crimes related to Bishop's murder, but the State held her in custody as a material witness.  She filed a motion to be released, which was granted upon her agreeing to appear for a deposition. McKinney did not object to this procedure, but he reserved the right to object if the State sought to use the recorded testimony at trial.  The deposition was taken on June 6, 1981, in the presence of McKinney and his counsel, who cross-examined Small.  Despite offering testimony on a wide range of subjects, on occasion Small

**MEMORANDUM DECISION AND ORDER - 20**

conferred with her counsel before answering questions, and she also selectively

invoked her privilege under the Fifth Amendment not to incriminate herself.

When McKinney's trial began, Small was eight months' pregnant with their

child.  By then, the State had charged her as a co-defendant, but her own trial was

scheduled to start later.

On November 5, 1981, the State announced that it intended to call Small in

its case in chief.  Small was present in the courthouse, but her counsel informed the

trial court and the parties that if she were called to the stand, she would invoke her

privilege under the Fifth Amendment.  McKinney's trial counsel asserted that he

also intended to use her as a witness, and that if she invoked the Fifth Amendment

he would "offer in evidence a number of matters from the deposition," which he

claimed were "helpful to our case."  (State's Lodging B-10, p. 688.)  The trial court

postponed its decision while it considered the manner in which the deposition

testimony could be introduced.

On November 9, a Monday, the trial court announced to the jury that it had

received "an affidavit" from a Dr. Hales the previous Friday, in which the doctor

indicated that Small was "afflicted with a sickness and infirmity at this time and

cannot appear at the trial."  (State's Lodging B-11, p. 1196.)  The court informed

the jury that Small's testimony would be introduced by reading a transcript of her

**MEMORANDUM DECISION AND ORDER - 21**

deposition.

In a subsequent hearing outside of the jury's presence, the court elaborated on the circumstances of Small's "sickness," stating that "last Saturday, or Friday, the Court was contacted by Dr. Hales.  Both counsel knew the substance of what he was saying, was that she, Dovey Small, the deponent, [was] presently in the hospital, and they were treating her for fear that she might have a miscarriage." (State's Lodging B-12, p. 1199.)  The court noted that the State had filed a supporting affidavit, "[a]nd on that basis and the lack of any showing by the defendant to controvert that, the Court has made the determination that here is a witness who is unavailable because of sickness or infirmity within the meaning of [Idaho Criminal] Rule 15."  (State's Lodging B-12, p. 1200.)

Defense counsel requested that the entire deposition be read to the jury, including Small's conferences with her attorney and those selected instances in which she refused to answer questions on Fifth Amendment grounds.  The court denied that request, ruling that Small's invocation of the Fifth Amendment was not admissible under the Idaho Rules of Evidence.  Defense counsel then objected to publishing the deposition to the jury, but he could not articulate a basis for his position.  (State's Lodging B-12, p. 1201.)

Each side was permitted to read portions of Small's testimony that they had

**MEMORANDUM DECISION AND ORDER - 22**

chosen, excluding those instances in which she invoked the Fifth Amendment or conferred with her counsel. Her admission that she had been convicted of a felony was also stricken by the trial court, though the grounds for that ruling are unclear.

On appeal, McKinney claimed that the admission of the deposition testimony violated his Sixth Amendment right to confrontation, but the Idaho Supreme Court relied exclusively on state rules and case law governing civil proceedings to affirm the district court's ruling. *McKinney I*, 687 P.2d at 575. In rejecting McKinney's main argument that the exclusion of particular parts of the deposition was erroneous, the Idaho Supreme Court concluded that "[t]he prior testimony made clear and no one in the courtroom, including the jury, could have been unaware that Dovey Small was an alleged co-conspirator in the murder-robbery of Bishop. There is no indication as to how a showing of Small's invocation of the Fifth Amendment or her conferences with her counsel would have either prejudiced or aided McKinney's case." *Id*. The court also found no abuse of discretion in excluding Small's admission that she had been convicted of a felony, but concluded that if any error had occurred, it was harmless beyond a reasonable doubt. *Id*. at 575-76.

> 2. <u>Standard of Review</u>

Because McKinney properly raised the Sixth Amendment claim in the Idaho

**MEMORANDUM DECISION AND ORDER - 23**

Supreme Court and yet the court analyzed the issue as one arising solely under state law, this Court must defer to any findings of fact, 28 U.S.C. § 2254(e)(1), but it shall review the federal legal claim *de novo*. *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004).

       3.    <u>Clearly Established Federal Law</u>

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him. U.S. Const. Amend. VI.   The Confrontation Clause is intended to "ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).

At the time of McKinney's trial and direct appeal, *Ohio v. Roberts*, 448 U.S. 56 (1980), set out the analytical framework for determining whether the admission of hearsay evidence violated a defendant's right to confrontation.  In *Roberts*, the Supreme Court held that the prosecution must "either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Id*. at 65 (citations omitted).  To show that the witness is unavailable, "the prosecutorial authorities [must] have made a good-faith effort to obtain his [or her] presence at trial." *Id*. at 74.  "The lengths to which the prosecution must go to

produce a witness ... is a question of reasonableness."  *Id.*

At the time, if the witness were truly unavailable, then his or her out of court statement could be admitted without violating the Confrontation Clause when the evidence bore adequate "indicia of reliability."  Reliability was inferred "without more in a case where the evidence falls within a firmly rooted hearsay exception."  *Id.* at 66.  In all other cases, the evidence was deemed sufficiently reliable and admissible only if it bears particularized guarantees of trustworthiness.[4]  *Id.*

### 4.    Unavailability

McKinney first argues that "there is no record evidence, merely a bare assertion, that Ms. Small was 'unavailable.'  She simply refused to testify."  (Docket No. 247, p. 17.)  Contrary to this argument, the contemporaneous evidentiary record before the trial and appellate courts, while not extensively detailed, pointed to only one conclusion: Small was not available to testify because she was in the latter stages of an at-risk pregnancy, and her doctor was treating her

---

[4] This aspect of the *Roberts* test has since been overruled by *Crawford v. Washington*, 541 U.S. 36 (2004).  In *Crawford*, the Supreme Court held that, regardless of reliability, a witness's testimonial out of court statements are not admissible under the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity to cross-examine.  *Id.* at 68  The parties in this case agree that *Crawford* cannot be applied retroactively to grant habeas relief.  *Whorton v. Bockting*, 127 S.Ct. 1173, 1177 (2007).

In any case, it is likely that the new rule would not benefit McKinney, because, as will be explained, Small was both unavailable to testify and McKinney had a prior opportunity to cross-examine her under oath, satisfying *Crawford*'s minimum requirements for admissibility under the Sixth Amendment.  *See, e.g., United States v. Cannon*, 539 F.3d 601, 602 (7th Cir. 2008) ("we see no reason, post- *Crawford*, to question the constitutionality of admitting fully cross-examined testimony preserved by a properly conducted Rule 15 deposition").

**MEMORANDUM DECISION AND ORDER - 25**

"for fear she may have a miscarriage." (State's Lodging B-11, p. 1199.) It is likely that the record is not better developed on this point because "[b]oth counsel knew the substance of what [the doctor] was saying," and there was no "showing by the defendant to controvert" the doctor's letter and the State's affidavit. (State's Lodging B-11, p. 1200.) The Idaho Supreme Court devoted a single introductory sentence to the matter, remarking that "the deposition was published, since Small was unavailable due to problems with her pregnancy." *McKinney I*, 687 P.2d at 575. The focus through the direct appeal was not on Small's unavailability but rather on the trial court's decision to limit the scope of the evidence that had been introduced.

McKinney notes correctly that Small offered additional testimony on this issue when she was deposed again in 1985, but rather than undermine the original finding, her later testimony supports it. Small was able to recall that she had to be taken to the hospital "quite a few times" during her pregnancy. (State's Lodging D-24, pp. 27-28.) She admitted that she was present at McKinney's trial but that she "refused to take the stand and testify against him" (*id*. at 28), which is corroborated by the hearing on November 5, 1981, during which the State announced it intended to call Small as a witness and her counsel responded that she would invoke the Fifth Amendment. Small also testified that the night after she

**MEMORANDUM DECISION AND ORDER - 26**

"was supposed to take the stand" (presumably November 5 or 6), she was taken "to the hospital because [she] went into labor really hard." (*Id*. at 27.) This corresponds with the trial court's recitation of the events to the jury and to the parties the following Monday, November 9. While Small also claimed that the baby was born right after McKinney was sentenced, this would not have been possible since he was sentenced in March 1982, several months after the baby's due date.

The Ninth Circuit has upheld a finding of unavailability under similar circumstances in *United States v. McGuire*, 307 F.3d 1192 (2002). In *McGuire*, the district court allowed the previous trial testimony of a witness to be admitted into evidence at a second trial after finding that the witness could not appear because she was in the third trimester of her pregnancy. *Id*. at 1205. On appeal, the Ninth Circuit affirmed, holding that "[t]hese risks in late pregnancy, when attested to by a physician, are an 'infirmity' within the meaning of the Rule." *Id*. Although the Federal Rules of Evidence were at issue in *McGuire* rather than the Confrontation Clause, there is no reason why the Ninth Circuit's conclusion as to what constitutes unavailability would be any different under the Constitution.

In sum, the prosecution must make a good faith effort to secure the witness's attendance. *Roberts*, 448 U.S. at 74. The lengths to which the prosecution must go

**MEMORANDUM DECISION AND ORDER - 27**

is a question of reasonableness judged by the facts and circumstances of each case, and the law does not require the doing of a futile act.  *Id.*  Given that the facts here showed that Small was suffering from complications during her late-term pregnancy, which McKinney did not seriously dispute at the time, the good faith requirement was satisfied.

     5.    <u>Indicia of Reliability</u>

The Court also finds that Small's testimony bore adequate indicia of reliability to have been admissible without violating McKinney's right to confrontation.

An exception to the hearsay rule for former testimony has a long history in American jurisprudence, *see e.g. Mattox v. United States*, 156 U.S. 237 (1895), and statements that are admitted pursuant to that exception commonly have been found to satisfy the Confrontation Clause.  *Roberts*, 448 U.S. at 68-73; *Mancusi v. Stubbs*, 408 U.S. 204, 213-16 (1972); *California v. Green*, 399 U.S. 149, 165-66 (1970).  Yet the United States Supreme Court has never squarely held that the exception is a "firmly rooted" one, such that satisfying its requirements would necessarily comply with the Confrontation Clause without a further showing of trustworthiness.  Several lower circuit courts have so held.  *See United States v. Mann*, 161 F.3d 840, 861 (5th Cir. 1998); *United States v. McKeeve*, 131 F.3d 1, 9

**MEMORANDUM DECISION AND ORDER - 28**

(1st Cir. 1997); *United States v. Kelly*, 892 F.2d 255, 262 (3d Cir. 1989); *United States v. Salim*, 855 F.2d 944, 954-55 (2d Cir. 1988).  It appears that the Ninth Circuit has not taken a conclusive stand on the issue.  *Compare United States v. Koon*, 34 F.3d 1416, 1426 (9th Cir. 1994) (noting without elaboration that the former testimony exception in Fed. R. Evid. 804(b)(1) is "a firmly rooted one"), overruled on other grounds by *Koon v. United States*, 518 U.S. 81 (1996), *with Alcala v. Woodford*, 334 F.3d 862, 882 (9th Cir. 2003) ("we do not opine on whether prior trial testimony is a firmly rooted hearsay exception, although we acknowledge some indications in the case law that it is").

       This Court need not determine whether Idaho's hearsay exception admitting this former testimony is a firmly rooted one because the evidence nevertheless bore particularized guarantees of trustworthiness.  There is no mechanical test for determining reliability, *see Dutton v. Evans*, 400 U.S. 74, 89 (1970), but the existence of safeguards closely approximating those present at a trial, such as the taking of testimony under oath subject to cross examination, have been found to satisfy the reliability component of the *Roberts* test.  *See United States v. Johnson*, 735 F.2d 1200, 1203 (9th Cir. 1984) (finding deposition testimony reliable because "counsel had an adequate opportunity to cross-examine [the witness] and availed himself of that opportunity").  Those safeguards were squarely in place here.

**MEMORANDUM DECISION AND ORDER - 29**

Small was under oath when she testified at her deposition, which was taken to preserve her testimony in the event that she did not appear at trial. McKinney was personally present, and his defense counsel cross-examined Small with the same motive that he would have if she were testifying at trial. To that end, he impeached her with her inconsistent statements from the preliminary hearing, and he elicited other favorable evidence that tended to exclude McKinney (and Small) from pre-planning the robbery and murder. Though it is true that Small selectively invoked the Fifth Amendment in response to some questions from the prosecutor over the course of her direct testimony, she answered all of the questions put to her by defense counsel on cross-examination, save one instance in which he asked her whether she had used marijuana. McKinney has not pointed to any specific topic that he was unable to test through cross-examination, had he wanted to do so.

The trial court's decision to exclude Small's references to the Fifth Amendment and the court reporter's notations of when she conferred with her attorney does not alter the analysis. Generally, no inference may be drawn from a witness's invocation of the Fifth Amendment in a criminal case, and McKinney has cited no authority showing that he had a right to have the jury be made aware that Small invoked  the Fifth Amendment or had conferred with her counsel before answering certain questions. *Cf. United States v. Castorena-Jaime*, 285 F.3d 916,

**MEMORANDUM DECISION AND ORDER - 30**

931 (10th Cir. 2002) ("[d]efendants do not, however, have the right to force a witness to invoke his Fifth Amendment privilege before the jury").

To be sure, the cold reading of a deposition transcript will gloss over subtle nuances in demeanor that could be exposed through live testimony, and the preference is undoubtedly for face-to-face confrontation in front of the jury, but the minimum requirements of the Constitution were satisfied in this case.

6.     Prejudice

Even if the admission of this evidence were a constitutional error, the Court alternatively concludes that McKinney would not be entitled relief because he cannot demonstrate that the error had a "substantial and injurious effect or influence in determining the jury verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

Those portions of Small's deposition that were read contained an uneven mix of statements that tended both to place the blame squarely on McKinney while simultaneously undermining the State's theory of pre-planning and a conspiracy. The most incriminating aspects–that McKinney returned to the bar alone, declared that he had shot Bishop, and then showed Small and Ada the body–did not stand alone and were corroborated by Ada's in-court testimony.  Other parts, while perhaps not exculpatory, were at least consistent with the theory of defense, such

**MEMORANDUM DECISION AND ORDER - 31**

as the following: Small and McKinney did not discuss harming Bishop at the Wheeless house; it was Bishop's idea to go target shooting but McKinney was reluctant to do so; the dog was with them in the car; and McKinney did not say that he shot Bishop "once in the stomach and five times in the head."  In addition, Small's testimony would have obviously been viewed with a jaundiced eye, as "no one in the courtroom, including the jury, could have been unaware that Dovey Small was an alleged co-conspirator in the murder-robbery of Bishop." *McKinney I*, 687 P.2d at 575.

Perhaps more importantly, other independent evidence strongly supported McKinney's guilt.  He was seen with the murder weapon on several occasions in the hours before Bishop was shot.  Casey Wheeless testified that Small and McKinney discussed how they needed money and intended to kill Bishop, even soliciting his help.  Denise Garner and Tana Hampton corroborated Wheeless's testimony.  McKinney himself admitted taking Bishop's car and personal possessions, and forging Bishop's signature on a credit card receipt.  He also gave several inconsistent or incomplete versions of the events, at one point even stating that "it looks like I'm going for murder," and the believability of his claim that the gun accidently discharged was seriously called into question by Craven's rebuttal testimony.

**MEMORANDUM DECISION AND ORDER - 32**

For these reasons, any error in admitting the deposition testimony did not have a substantial and injurious influence or effect on the jury's verdict such that the state court's judgment must be overturned in this collateral habeas proceeding.

## Prosecutorial Misconduct (Claim 6)

In his next guilt-phase claim, McKinney asserts that "trial prosecutor tainted the impartiality of the jurors by appealing to their passions and prejudices, by arguing matters not in evidence, by arguing his personal opinion and religious references to the Old Testament, and by making misstatements of law to the jury." (Docket No. 238, p. 23.)  The Idaho Supreme Court summarily rejected this issue after "find[ing] no error."  *McKinney I*, 687 P.2d at 576.

The standard for a claim of prosecutorial misconduct on habeas review is a "narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).  A prosecutor's comments or actions that may be considered inappropriate under rules of fair advocacy, or even reversible error on direct review, will not warrant federal habeas relief unless the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly*, 416 U.S. at 643.

1.     Comments on the Burden of Proof

**MEMORANDUM DECISION AND ORDER - 33**

McKinney asserts that the prosecutor advised the jury of an improper definition of reasonable doubt and misled the jury about the State's burden of proof. The first instance allegedly occurred during the following exchange in jury selection:

[Prosecutor]:      We've got a lot of people on this panel that are used to dealing with very little margin of error in their work. Are you one of them?

Mr. Grossman:      No.

[Prosecutor]:      Oh, you're used to large margins of error. That's good. Well, then you can appreciate what the term "beyond a reasonable doubt" means, can't you?

Mr. Grossman:      Yes. I'm not sure of the definition of "reasonable doubt" yet. I heard the Judge say, but I'm not sure I totally absorbed it.

[Prosecutor]:      Okay.

Mr. Grossman:      I know it's not no doubt whatsoever, but I'm not sure how precise we have to be in understanding the reasonable doubt.

[Prosecutor]:      The Court will undoubtedly instruct you on that again. And do you have any disagreement with the fact that that is our burden, whatever the Judge will ultimately instruct you on it as.

Mr. Grossman:      No. I have no problems with that.

(State's Lodging B-8, p. 240.)

McKinney argues that in this exchange the prosecutor equated "large

**MEMORANDUM DECISION AND ORDER - 34**

margins of error" with reasonable doubt.  He also contends that, later in the jury

selection, the prosecutor informed the jury that it should not "even consider just

possible doubt."  (Docket No. 247, p. 46.)

Neither of these brief instances amount to prosecutorial misconduct.  The

first was at most an ambiguous reference to "margins of error" and reasonable

doubt, and it was a minor exchange that ended with the prosecutor informing the

juror that the judge would instruct him on the correct standard.  The second phrase

about not considering just possible or imaginary doubt or the like is not an

incorrect statement of law.  *Cf. Victor v. Nebraska*, 511 U.S. 1, 17 (1994).

McKinney contends that the prosecutor also made "several other similarly

misleading remarks," but he has not provided the Court with argument or analysis

concerning any additional statements concerning the reasonable doubt standard.

2.    Appeal to Emotion and Prejudice

In his opening statement, the prosecutor informed the jury that Ada Mangum

would testify, among other things, that "Randy McKinney, in reminiscing over the

thing that he had done, makes the comment that 'it's hard to kill a white man.'  He

said, 'It was harder than I thought.  It's not near as bad as killing a nigger.'"

(State's Lodging B-9, p. 411.)

In her testimony on this subject, Mangum claimed that McKinney had

**MEMORANDUM DECISION AND ORDER - 35**

actually said, "it was easier for him to kill a black man than it was a white man."
(State's Lodging B-9, p. 488.)  When the prosecutor pressed her to "tell us
specifically, what did he say," she replied, "[t]hat's what he said.  It was easier – I
mean it was harder for him to kill a white man than it was a black man."  (*Id*.)

    In his closing argument, the prosecutor again characterized this evidence as
"[McKinney] makes a comment that he had a hard time killing this guy ... [s]aid it
was a lot easier to kill a nigger."  (State's Lodging B-13, p. 1631.)

    McKinney now claims that the prosecutor's use of the word "nigger" was a
racially-charged appeal to the jury's emotions and, in context, an improper
reference to an uncharged murder.  This Court agrees that the prosecutor should
have refrained from using that particular word, particularly in his closing
argument, since by that time Ada Mangum had testified that McKinney had
referred to a "black man."  As such, the prosecutor misstated the evidence.  Even if
he expected Mangum to testify in a certain way, when that expectation did not bear
fruit he should have exercised more caution before using a racially sensitive term.

    On the other hand, the prosecutor had a right to comment on the evidence
presented at trial, and the subject on which the prosecutor commented was clearly
supported by the evidence.  McKinney may not have used the exact phrasing that
the prosecutor suggested he did, but, according to Ada, he expressed the *sentiment*

**MEMORANDUM DECISION AND ORDER - 36**

in very similar terms.  McKinney's counsel failed to object on the grounds he now

asserts, either to the testimony or to the prosecutor's comments, but the evidence

appears to be relevant and admissible against McKinney as an admission of guilt to

the charged offenses.  This is not a case in which a prosecutor intentionally used a

racial epithet in an effort to demean the defendant personally or to inflame the

prejudices of the jury, and cases that address those circumstances are inapposite.

     3.    <u>Appeal to Religion</u>

Near the end of his closing argument, the prosecutor remarked that Bishop

was "laying in a cold grave somewhere, and his blood is crying out for justice.

And he deserves it.  And if you don't give it to him, he'll never get it."  (State's

Lodging B-13, p. 1702-03.)  McKinney contends that this was a religious

exhortation based on Genesis 4:10 in the King James Version of the Bible, which

reads, "And he said, What hast thou done? the voice of thy brother's blood crieth

unto me from the ground."

On its face, the prosecutor's language appears to be a rhetorical flourish that

brought his lengthy summation to a close; it is not a self-evident reference to a

specific biblical verse.  He did not expressly cite religious authority, nor did he ask

the jury to resort to biblical law in adjudicating the case.  Serving as an additional

buffer, the trial court instructed the jury to consider only its instructions on the law

**MEMORANDUM DECISION AND ORDER - 37**

as applied to evidence presented in court.  (State's Lodging B-13, p. 1594.)

Even if the remarks exceeded the bounds of proper argument, they did not constitute such egregious misconduct as to deprive McKinney of his right to a fair trial, as discussed below.

      4.    <u>Reference to the Assassination Attempt on President Reagan</u>

For his last example of alleged misconduct, McKinney points to the prosecutor's remark in his opening statement that the murder weapon was "[a] Saturday night special.  The same type of gun that President Reagan had been shot with." (State's Lodging B-9, p. 401.)  Although Richard Craven would later confirm that the weapon was a "Saturday night special," there was no evidence presented at trial that it was similar to the one that John Hinkley had used in attempting to assassinate President Reagan.  It is unclear whether the prosecutor believed that he would be able to elicit such evidence when he made his opening statement, but the claim was not repeated in closing argument.

Defense counsel did not object to the remark, and the jury was instructed that an opening statement "is not itself evidence."  (State's Lodging B-9, pp. 380-81.)  This Court finds the comment at the beginning of the trial, if improper, to be minimal, isolated, and without lasting effect.

      5.    <u>Cumulative Due Process Analysis</u>

**MEMORANDUM DECISION AND ORDER - 38**

The question before this Court is not whether any of these comments crossed the line into improper argument, but whether they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643.  To the extent that any of the remarks amounted to misconduct, they were minor blemishes in the face of an extensive record containing strong evidence of guilt.  The sting from any improper comments would have been further removed by the trial court's instruction to the jury that arguments "are not evidence, and are not to be considered by you as such, and are proper matter [sic] to consider only insofar as the attorneys keep within the evidence admitted upon the trial, and the instructions of the Court."  (State's Lodging B-13, p. 1612.)

Finding no due process violation, this Court must deny relief.

## Handcuffing in the Courtroom (Claim 12)

In this claim, McKinney alleges that he was deprived of due process of law when he "was exposed to members of the jury while confined in handcuffs contrary to well-established dictates of Supreme Court precedent."  (Docket No. 238, p. 31.)

1.    Background

On the seventh day of trial, defense counsel moved for a mistrial on the ground that "we have observed personally that each time the sheriff brings Randy

MEMORANDUM DECISION AND ORDER - 39

into the courtroom, he is in handcuffs.  And each time before Randy leaves, he is in

handcuffs." (State's Lodging B-11, p. 1071.)  Counsel then testified under oath

about the circumstances, indicating that when the Sheriff brought McKinney to and

from the courtroom counsel had "observed that the defendant has been in

handcuffs, bracelet-type handcuffs." (*Id.* at 1072.)  He further testified that he had

seen jurors in the "outer foyer" area when the transport occurred, and that jurors

were still in the courtroom on other occasions when the Sheriff cuffed McKinney

to take him out. (*Id*. at 1072-73.)  Defense counsel  "couldn't represent or testify,

Your Honor, that [he] saw a particular juror actually observing that.  Only that they

were still passing from the courtroom." (*Id*. at 1077.)  No juror was questioned

about whether he or she had seen McKinney in handcuffs.

The trial court denied the motion for mistrial, agreeing that "we are

supposed to protect a jury from prejudice of a defendant," but observing that "[w]e

don't have him sitting here in cuffs.  He's free.  He's not shackled at all.  Coming

and going, apparently he's been cuffed." (State's Lodging B-11, pp. 1075-76.)

The trial court concluded, "I don't conceive that there's been any great prejudice to

the defendant in this trial by being brought to the area of the courtroom in cuffs

and having them taken off.  There's no great display of him being in cuffs." (*Id*.)

On direct appeal, the Idaho Supreme Court rejected this claim after finding

that "there is no showing here, nor was there at the trial court, that any juror may have seen McKinney in handcuffs ... [t]he mere possibility that some juror may have seen McKinney in handcuffs does not satisfy appellant's burden of showing prejudicial error on appeal."  *McKinney I*, 687 P.2d at 575.

      2.   <u>Standard of Review</u>

Because the Idaho Supreme Court issued a reasoned, though brief, decision addressing this claim on the merits, McKinney must show that its decision was contrary to or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  All state court findings of fact must be presumed to be correct unless rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

      3.   <u>Clearly Established Federal Law</u>

The Sixth and Fourteenth Amendments to the United States Constitution assure a criminal defendant the right to a fair trial.  *Estelle v. Williams*, 425 U.S. 501, 503 (1976).  In *Illinois v. Allen*, 397 U.S. 337 (1970), the United States Supreme Court considered the removal of an obstreperous defendant from his criminal trial, recognizing that while "binding and gagging might possibly be the fairest and most reasonable way to handle" the situation, "even to contemplate

**MEMORANDUM DECISION AND ORDER - 41**

such a technique ... arouses a feeling that no person should be tried while shackled and gagged except as a last resort."  *Id*. at 344.  In *Estelle*, the Supreme Court held that compelling a defendant to stand trial in identifiable jail clothing eroded the presumption of innocence.  425 U.S. at 512.

By the time of the Idaho Supreme Court confronted this issue in the present case, lower circuit courts following *Estelle* and *Allen* had interpreted the due process guarantee of a fair trial as requiring a defendant to be free from shackles unless exceptional circumstances were present.  *See e.g. Corley v. Cardwell*, 544 F.2d 349, 352 (9th Cir. 1976) ("[a] defendant who, absent exceptional circumstances, is forced to stand trial manacled or in prison garb is denied due process"); *Zygadlo v. Wainwright*, 720 F.2d 1221, 1223 (11th Cir. 1983) (similar). Recently, the Supreme Court reiterated that "[t]he law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need."  *Deck v. Missouri*, 544 U.S. 622, 630 (2005).

4.    Discussion

The Idaho Supreme Court found that McKinney had made no showing that any juror had seen him in shackles.  This finding is a reasonable one in light of the evidence presented in state court, which established that McKinney may have been

**MEMORANDUM DECISION AND ORDER - 42**

cuffed during transport by the Sheriff, but he was not shackled when trial was in session.  Additionally, while trial counsel testified that he had observed McKinney being taken to and from the courtroom in handcuffs in close proximity to jurors, he "couldn't represent or testify ... that [he] saw a particular juror actually observing that."  (State's Lodging B-11, p. 1072.)  No juror was questioned.

Even if a juror or jurors had seen McKinney, it would have likely been a brief observation when he was brought in or out of the courtroom, and there is certainly no evidence that he was "forced to stand trial manacled."  *See Corley*, 544 F.2d at 352.  In this respect, his case is similar to *Ghent v. Woodford*, 279 F.3d 1121 (9th Cir. 2002).  In *Ghent*, the defendant was transported into the courtroom in handcuffs, and the district court found that at least some jurors had seen him in cuffs in a hallway, but the Ninth Circuit declined to find a due process violation. *Id*. at 1133.  In reaching that conclusion, the Court wrote, "[t]he jury's 'brief or inadvertent glimpse' of a shackled defendant is not inherently or presumptively prejudicial, nor has Ghent made a sufficient showing of actual prejudice."  *Id*. Here, likewise, a juror's view of a handcuffed McKinney would have been a brief or inadvertent glimpse as he was passing into or out of the courtroom.

Given the state of the evidence developed in state court, and in light of clearly established federal law, the Idaho Supreme Court's adjudication of this

**MEMORANDUM DECISION AND ORDER - 43**

claim did not result in a decision that was contrary or involved an unreasonable application of clearly established federal law, or was based on an unreasonable determination in light of the evidence presented.  Relief shall be denied.

## PENALTY PHASE CLAIMS

### Ineffective Assistance of Counsel – Mitigation Investigation (Claim 1(f))

McKinney next alleges that his appointed counsel "was ineffective in that he failed to investigate whether Petitioner had a history as an abused child or a history of physical and psychological trauma or disorder which might act as a circumstance which could mitigate the penalty to be imposed for this crime, and failed to present factual and expert evidence to the trial court."  (Docket No. 238, p. 13.)

For the reasons set forth below, the Court agrees that McKinney was deprived of his Sixth Amendment right to the effective assistance of counsel during his capital sentencing proceeding.  The Court further concludes that habeas relief is warranted because the Idaho Supreme Court's adjudication of this claim involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

1.  The Sentencing Hearing

The aggravation and mitigation hearing took place over two partial days in

**MEMORANDUM DECISION AND ORDER - 44**

March 1982.  Urging the trial court to impose a death sentence, the State relied

primarily on the evidence developed at trial to support two statutory aggravating

circumstances: that the murder was committed with the utter disregard for the

value of human life (Idaho Code § 19-2515(f)(6)); and that the murder was

committed during a robbery (a first-degree felony murder) with the specific intent

to cause the death of a human being (Idaho Code § 19-2515(f)(7)).  (State's

Lodging B-14, pp. 1801-06.)

McKinney's defense counsel, William Carlson, presented the testimony of

three witnesses in mitigation of punishment, two close family members and a

psychologist.  McKinney's mother, Karen Ponting, testified that her son had been a

follower who was easily led by females.  She also claimed that he was always very

quiet, treated others with kindness, and had done well in school.  McKinney's great

aunt testified similarly to Ms. Ponting.

The psychologist, Dr. Gary Payne, testified that he had administered a series

of psychological tests to McKinney.  From his evaluation, Dr. Payne concluded

that while McKinney had "no major defect," he "suffer[ed] from an inadequate

personality disorder," which made him impulsive.  (*Id*. at 1763.)  Dr. Payne

testified that he "would be easily led" and would not "inspire great confidence or

certainty in a follower."  (*Id*. at 1766.)  He also believed that McKinney "would

**MEMORANDUM DECISION AND ORDER - 45**

behave as someone who was younger, perhaps in late adolescence, limited maturity, working hard to please, perhaps adopting what are outward trappings might suggest that he was conforming for acceptance." (*Id.* at 1767.)

The general theme of defense counsel's mitigation case, as reflected by his closing argument to the court, was that McKinney was an easily-led young man who came under the spell of a manipulative older woman, and that under her influence and the influence of alcohol and drugs, he committed crimes that he ordinarily would not have committed. Counsel also briefly mentioned that some doubt lingered as to who actually fired the fatal shots. But at no point did he suggest that McKinney's background or childhood was anything other than fairly routine, perhaps with a few minor bumps along the way.

2.   The District Court's Findings

The state district court declined to apply the "utter disregard" aggravating circumstance, but the court did find that the State had proven beyond a reasonable doubt that McKinney intentionally killed Bishop by shooting him in the head during the course of a robbery, supporting the felony murder plus specific intent aggravator.

The district court expressly considered McKinney's arguments in mitigation, which it characterized in general terms as "the youth of the defendant; the

**MEMORANDUM DECISION AND ORDER - 46**

defendant's background and environment (as indicators of personality and character); the defendant's degree of culpability for the crime committed; and the defendant's potential for rehabilitation."  (State's Lodging B-2, p. 148.)  The court rejected defense counsel's suggestion that McKinney was an inexperienced and easy-going person, instead finding that he "is a 'street-wise' nineteen-year-old whose own statements show a pattern of criminal behavior beginning at the age of twelve, though his only formal criminal record prior to this time shows only one contact with the justice system."  (*Id.* at 151.)

The state district court concluded that mitigating circumstances, "variously evaluated and found or rejected," did not outweigh the single aggravating circumstance found to exist, and it imposed the death penalty.  (State's Lodging B-2, p. 154.)  On direct appeal, the Idaho Supreme Court affirmed the district court's decision. *McKinney I*, 687 P.2d at 576.

### 3.    The Post-Conviction Evidence

One of McKinney's claims during his initial post-conviction proceeding was that his trial counsel had been constitutionally deficient in failing to uncover and offer evidence that McKinney had suffered severe physical, sexual, and emotional abuse as a child.  A new district court judge was assigned to the case, who concluded that an evidentiary hearing was necessary, at which McKinney

**MEMORANDUM DECISION AND ORDER - 47**

presented testimony on this subject from his mother Karen (having changed her last name to Edwards), his sister Laurie Newberry, his brother Mitchell Ponting, himself, and his trial counsel William Carlson.

Karen Edwards testified that McKinney's father, James Ponting, began to abuse McKinney when he was five years old.  As the violence escalated, Ponting would throw McKinney and the other children against walls, beat them with his fists, and whip them with rubber hoses, sticks, and a belt.  Ponting also regularly used an assortment of drugs in front of the children, including marijuana, LSD, cocaine, speed, and cannabinol.  For his enjoyment, he spiked the children's ice cream with PCP, eventually introducing them at a young age to alcohol and drugs. Karen Edwards was also aware that Ponting was sexually abusing Laurie.  The home situation had deteriorated sufficiently at one point that Edwards was hospitalized after attempting to overdose on pills.  (State's Lodging D-23, pp. 7-44.)

Edwards testified that she spoke with Williams Carlson before the sentencing hearing for a total of about 30 minutes.  While Carlson asked her generally about McKinney's childhood and background, he never pointedly asked whether any abuse had occurred, and she did not volunteer the information because she "didn't know that it would be important.  That's something you just don't go

**MEMORANDUM DECISION AND ORDER - 48**

around talking about ... " (State's Lodging D-23, p. 10.)

Laurie Newberry testified similarly to her mother, but added details of significant and longstanding sexual abuse.  She corroborated her mother's testimony that Ponting often beat the children, including one instance in which he whipped McKinney so vigorously with a garden hose that it resulted in bleeding and welts.  She also testified that Ponting routinely had sexual intercourse with her from the time that she was eight years old.  On some of these occasions, Ponting would force McKinney to hold Laurie down, if she resisted, so he could penetrate her more easily.  If McKinney tried to stop him or otherwise interfere, he would be beaten.  According to Laurie, when McKinney was a young teenager, Ponting also coerced one of McKinney's girlfriends to have sex with Ponting and Laurie.  She further claimed that William Carlson never contacted her before the sentencing hearing, and, like her mother, she did not come forward because she did not know that this type of information was relevant.  (State's Lodging D-23, pp. 45-73.)

McKinney's brother confirmed the childhood abuse.  He added that he came home one day after he had recently gotten married to find his new wife in bed with his father.

McKinney corroborated the testimonies of his family members.  He admitted that his father had forced him to hold Laurie down while he raped her.  He also

claimed that he had been fondled by one of Ponting's acquaintances when he was a boy and on two other separate occasions by other men when he was a teenager. (State's Lodging D-23, pp. 96-131.)

Carlson was also called as a witness. He testified that he was unaware of any sexual abuse, physical abuse, or drug encouragement in the home. Although he spoke with members of the family to prepare for sentencing, he was "certain" that he did not question anyone about those matters. When McKinney's post-conviction counsel asked him, "isn't it a fact that these items that have been discussed here today you just didn't think about asking about," Carlson responded, "I suppose it is. Yes. I think it is." (State's Lodging D-23, p. 94.)

> 4. The District Court's Ruling and the Appellate Decision

The newly assigned district court judge denied this claim on its merits. In doing so, he did not reject McKinney's evidence as untrue or lacking in credibility; on the contrary, he wrote that "the court accepts every element of testimony given at the hearing on petitioner's action for post-conviction relief regarding childhood physical, sexual and drug abuse. The court also concedes that petitioner should have been given an opportunity to present evidence of what occurred during childhood ... " (State's Lodging D-22, p. 176.)

Despite accepting every element of this evidence, the court concluded that

**MEMORANDUM DECISION AND ORDER - 50**

McKinney had suffered no prejudice.  In reaching that conclusion, the court framed McKinney's argument primarily as one in which he was claiming that because Robert Bishop allegedly made sexual advances to himself and Dovey Small, the excluded evidence of childhood abuse would have tended to explain his overreaction to those advances.  In other words, the state court seems to have treated this claim as an attempt to put forward some type of partial but imperfect defense in mitigation, and it squarely dismissed that argument as contrary to the evidence:

> Yet, the petitioner devised a plan to rob and murder his victim prior to the time that any putative homosexual advances to him occurred.  If there had been no prior plan to kill petitioner's victim, and if the murder would have occurred directly after advances made to petitioner, without a substantial cooling-off period in which petitioner could have regained his sensibilities, the situation might be different.  *However, this court finds completely untenable petitioner's contention that childhood sexual abuse problems should justify his actions where a concerted plan to commit those actions had been formulated prior to the time advances were made*.

(State's Lodging D-22, p. 177)(Emphasis added.)

The Idaho Supreme Court affirmed.  In a brief opinion, it quoted the district court's ruling and indicated that it agreed "with the decision of the trial court, and its reasoning."  *McKinney II*, 772 P.2d at 1221.  The Idaho Supreme Court reiterated the essential facts of the crime, concluding that the "killing was not a spur of the moment decision, but rather McKinney lured his victim into the desert

**MEMORANDUM DECISION AND ORDER - 51**

on a pretense of a target practice expedition, and shot the victim execution style, thus accomplishing his well thought out scheme. We find no error." *Id.*

5.      Clearly Established Federal Law

By the time of the Idaho Supreme Court's decision, it was clear that the Sixth Amendment right to the effective assistance of counsel applied to the penalty phase of a capital trial. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984).

As set out earlier in this Memorandum Decision, a successful claim under the *Strickland* test is comprised of two elements: (1) unreasonably deficient performance by trial counsel, and (2) actual prejudice to the defendant's right to a fair adversarial proceeding. *Id.* at 687.  In assessing the reasonableness of counsel's performance, the reviewing court must reconstruct the facts that confronted counsel at the time and avoid the benefit of hindsight. *Id.* at 689.  The focus of the prejudice component is on the fairness and reliability of the outcome. To that end, the test for prejudice is whether, but for counsel's unprofessional errors, there is a "reasonable probability" that the result would have been different. *Id.* at 694.   A reasonable probability is one that is "sufficient to undermine confidence in the result." *Id.*

6.      Discussion

The Idaho Supreme Court moved directly to the prejudice component of the

**MEMORANDUM DECISION AND ORDER - 52**

*Strickland* test and approved the lower court's reasoning on that issue.  Because

there is no state court decision addressing the first part of the test, this Court must

review the professional reasonableness of trial counsel's mitigation investigation

*de novo.  See Rompilla v. Beard,* 545 U.S. 374, 390 (2005) ("[b]ecause the state

courts found the representation adequate, they never reached the issue of prejudice,

and so we examine this element of the *Strickland* claim *de novo*").

The United States Supreme Court has declined to adopt specific guidelines

for reasonably adequate attorney conduct under the Sixth Amendment, but it has

looked to the American Bar Association Standards for persuasive guidance in

determining what was reasonable at a particular time.  *Wiggins v. Smith*, 539 U.S.

510, 524 (2003) (quoting *Strickland v. Washington*, 466 U .S. at 688).  According

to the ABA Standards in effect in 1982, a reasonably competent defense attorney in

a capital case was expected to complete a thorough investigation of the defendant's

background and social history in advance of the penalty phase.  *See Williams v.

Taylor*, 529 U.S. 362, 396 (2000) (citing 1 ABA Standards for Criminal Justice

4-4.1, cmt. at p. 4-55 (2d ed.1980)).

When a habeas petitioner claims that counsel failed to present a particular

type of mitigating evidence, the relevant inquiry is not whether counsel should

have presented the evidence but whether the investigation supporting counsel's

**MEMORANDUM DECISION AND ORDER - 53**

decision was itself reasonable.  *Wiggins*, 539 U.S. at 524.  A defense attorney's

tactical or strategic choices made after an adequate inquiry into the facts and law

are virtually unchallengeable under *Strickland*.  *Gerlaugh v. Stewart*, 129 F.3d

1027, 1033 (9th Cir. 1997).  But to be considered adequate, a tactical choice must

have been made after counsel has conducted "reasonable investigations or [made] a

reasonable decision that makes particular investigations unnecessary."  *Strickland*,

466 U.S. at 691.  In addition, "[e]ven if [a] decision could be considered one of

strategy, that does not render it immune from attack-it must be a *reasonable*

strategy."  *Jones v. Wood*, 114 F.3d 1002, 1010 (9th Cir. 1997) (emphasis in

original).

There is no evidence in this record that defense counsel made a reasonably

informed tactical decision not to investigate McKinney's background thoroughly,

looking for hints of abuse or neglect, which he admitted would have been a fruitful

area of inquiry.  (State's Lodging D-23, p. 94.)  Indeed, when asked whether it was

true that he just did not think to ask about this subject, despite having spoken to

some family members, he replied, "I suppose it is.  Yes.  I think it is."  (*Id.*)

Therefore, counsel's "failure to investigate thoroughly resulted from inattention,

not reasoned strategic judgment."  *Wiggins*, 539 U.S. at 526.

Nor is the Court persuaded by Respondent's argument that defense counsel's

**MEMORANDUM DECISION AND ORDER - 54**

failure to inquire can be laid at the feet of McKinney or his family.  Contrary to the State's implication that the defendant or defense witnesses should volunteer all information that may possess legal relevance, it is defense counsel's job to know which subjects are relevant at a capital sentencing hearing, to mine those areas in interviews and through document review, and then to assess the weight and utility of the evidence.  At the post-conviction evidentiary hearing, Karen Edwards testified that she was unaware that this subject would be have been important, and "[t]hat's something you just don't go around talking about .... " (State's Lodging D-23, p. 10.)  Her observation has a ring of truth today, and it stands to reason that this would have been a more uncomfortable topic of discussion over 25 years ago. McKinney's sister, Laurie Newberry, was never contacted by defense counsel. The State cannot appoint an attorney to assist a defendant facing a death sentence who fails to ask the right questions and then later hide behind the ignorance of the defendant, his family, or other witnesses.  *Cf. Rompilla*, 545 U.S. at 384-85 (finding that defense counsel was unreasonable for failing to investigate obvious sources of mitigation despite the defendant's unhelpfulness).

As a result, the Court finds that McKinney has carried his burden to show that his trial counsel's mitigation investigation fell below an objective standard of reasonableness.  The Court will now address whether the Idaho Supreme Court's

**MEMORANDUM DECISION AND ORDER - 55**

determination that McKinney had not shown actual prejudice from counsel's

failure to investigate was contrary to or an unreasonable application of clearly

established federal law under 28 U.S.C. § 2254(d)(1).

As an initial matter, the state courts seem to have approached the *Strickland*

prejudice question armed with a narrow understanding of the role that mitigating

evidence could play in a capital case under the Eighth Amendment.  A fair reading

of both the Idaho Supreme Court's opinion and the state district court's ruling is

that the state courts viewed the excluded evidence as having potential mitigating

weight only insofar as it offered a partial explanation for the *crimes*.  Neither court

was impressed with such a reinterpretation of the events because of the strong

evidence that the robbery and murder were pre-planned and coldly executed.

In 1976, however, the United States Supreme Court announced that states

seeking to impose a death sentence consistent with the Eighth Amendment must

allow for individualized consideration of the circumstances of the crime *as well as*

the character and record of the offender.  *Gregg v. Georgia*, 428 U.S. 153, 189

(1976); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).  Two years later,

the Supreme Court held that the Eighth Amendment required "the sentencer, in all

but the rarest kind of capital case, not be precluded from considering, *as a*

*mitigating factor*, any aspect of a defendant's character or record and any of the

circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasis in original). And two months before the sentencing hearing in this case, the Supreme Court expressly rejected an assertion that mitigating evidence is irrelevant if it does not "provide a legal excuse from criminal responsibility," finding that a young defendant's "turbulent family history, of beatings by a harsh father, and of severe emotional disturbance is particularly relevant." *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982).

In light of *Woodson*, *Lockett*, and *Eddings*, the law was fully developed by 1982, and certainly by 1989, that relevant mitigation in a capital case could encompass any evidence that the defendant "proffers as a basis for a sentence less than death," which would include evidence tending to humanize the defendant in addition to providing a nexus to the charged offense. Despite this well-defined legal landscape, the Idaho Supreme Court did not expressly acknowledge that a deprived childhood might carry independent mitigating weight regardless of the tendency that it had to "explain" or "justify" the crime.[5]

_____

[5] It is true that McKinney argued in state court that the excluded evidence might place his criminal actions in context because of Bishop's purported sexual advances, and the state courts seemed to isolate and react to that part of his argument, but he also contended that the evidence was relevant for its own sake under clearly established law. (State's Lodging E-26, pp. 9-10.) It is a court's duty to apply the correct standard of law when a legal issue has been raised before it.

**MEMORANDUM DECISION AND ORDER - 57**

In any event, while the state court's narrow view of mitigation informs the analysis, it is not dispositive.  Instead, because the issue is whether McKinney was deprived of his right to the effective assistance of counsel, the pertinent inquiry is whether the Idaho Supreme Court's decision involved an unreasonable application of *Strickland*.  Although AEDPA's reasonableness review is deferential to the state court, and more leeway must be built in for the state court to apply rules of general applicability, *see*, *e.g.*, *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004), "[d]eference does not by definition preclude relief.  A federal court can disagree with a state court's ... determination and, when guided by AEDPA, conclude the decision was unreasonable."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  This is such a case.[6]

The sentencing court found a single aggravating factor beyond a reasonable doubt: that McKinney committed a first degree murder during the course of a robbery with the specific intent to kill.  This Court agrees that many of the facts in this case are aggravated beyond a typical first-degree murder.  The trial evidence showed convincingly that when it became clear that Jackie Wheeless would not provide any money to Small and McKinney, they hatched a plan to lure Bishop to a

---

[6]  Because the Idaho Supreme Court cited the two-part *Strickland* test, and it did not confront a materially indistinguishable set of facts yet arrive at a different result, its decision was not "contrary to" *Strickland*.

**MEMORANDUM DECISION AND ORDER - 58**

remote area with the intent of robbing and killing him.  The murder was accomplished in a cold-blooded fashion, with a single shot to the chest followed some indeterminate amount of time later by four execution-style shots to the head. The evidence that McKinney rather than Small fired all of these shots, though not wholly free of uncertainty, was strong.

On the other side of the balance, defense counsel put on a slim case for life. He attempted to portray McKinney as an impulsive young man who had a fairly unremarkable upbringing, with a few minor exceptions, and who fell under the sway of Dovey Small.  He presented only three witnesses, two of whom were family members who claimed that McKinney was a kind and gentle person, notwithstanding the glaring counter-example facing the sentencing judge in the case before him.  The entire sentencing hearing lasted a few hours over the course of two days.

In assessing prejudice, a reviewing court must weigh the evidence in aggravation against the totality of the available mitigating evidence, including that which was not presented at the sentencing hearing. *Wiggins*, 539 U.S. at 534.  "[A] penalty phase ineffective assistance claim depends on the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented." *Stankewitz v. Woodford*, 365 F.3d 706,

**MEMORANDUM DECISION AND ORDER - 59**

716 (9th Cir. 2004).

The discrepancy in this case was exceedingly large.  Counsel failed to investigate and uncover a wealth of information that would have painted a starkly disadvantaged background, "every element" of which the post-conviction court accepted as true.  As a young child, McKinney's life was dominated by a tyrannical and abusive father.  He was regularly beaten and whipped.  He was involuntarily introduced to drugs before he was a teenager, and he was routinely exposed to drug sales out of the home.  In his formative years, McKinney was sexually abused by older males, beginning with one of his father's acquaintances. In perhaps the most egregious example of cruelty, his father forced him to hold down his sister while his father repeatedly raped her.

In short, by the time McKinney committed this crime at 19 years of age, which would now be one year removed from categorical exclusion from a death sentence, *see Roper v. Simmons,* 543 U.S. 551 (2005), his young life had been a nightmarish mix of abuse and deprivation.  This is the clearly the type of mitigating evidence that "might well have influenced the [judge's] appraisal of [McKinney's] moral culpability." *Williams v. Taylor*, 529 U.S. 362, 398 (2002).

That is not to say, of course, that McKinney's background in any way justified the calculated and cold-blood murder of Robert Bishop, Jr., but the

**MEMORANDUM DECISION AND ORDER - 60**

complete mitigation profile is much more powerfully humanizing than that which was presented to the sentencing judge, especially when considered in conjunction with McKinney's young age and lack of a violent record.  Moreover, McKinney was not required to prove to the state court that it was more likely than not that the outcome would have been different; he needed to establish a "reasonable probability" of a different sentencing outcome, which is a showing "sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  The Idaho Supreme Court never expressly re-weighed *all* of the mitigating evidence against the single aggravator, but its implicit finding that there was no reasonable probability that a sentencing factfinder would have struck a different balance, even after placing this weighty evidence on the mitigation side of the scale, is an objectively unreasonable application of clearly established federal law.

This Court's conclusion on this point is guided by recent cases from the United States Supreme Court and the Ninth Circuit Court of Appeals that have found ineffective assistance of counsel during the penalty phase of a capital sentencing proceeding in similar circumstances.[7]

In *Williams v. Taylor*, 529 U.S. 362 (2002), the defendant murdered an

---

[7]  The Court cites these cases not as clearly established law at the time of the Idaho Supreme Court's decision in this case, but as persuasive applications of *Strickland* in similar contexts.

**MEMORANDUM DECISION AND ORDER - 61**

elderly man after the man refused to loan him a "couple of dollars." *Id*. at 363. At the sentencing hearing, the prosecution proved that the defendant had committed several other violent felonies. *Id*. at 368-69. Somewhat like the present case, defense counsel offered evidence that the defendant was a "nice boy" and not a violent person. In finding the state court's decision an objectively unreasonable application of *Strickland*, the Supreme Court concluded that counsel's failure to present evidence of the defendant's borderline mental retardation and his nightmarish childhood "might well have influenced the jury's appraisal of his moral culpability," even though the aggravating circumstance of future dangerousness was well-supported by the evidence. *Id*. at 398-99.

*Wiggins* is equally instructive. There, defense counsel failed to uncover evidence of the defendant's severely deprived childhood. 539 U.S. at 534-35. The Court noted that "[h]ad the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Id*. at 537. As here, "Wiggins [did] not have a record of violent conduct that could have been introduced by the State to offset this powerful mitigating narrative." *Id*.

The Supreme Court also reached a similar result in *Rompilla v. Beard*, 545 U.S. 374 (2005), in which defense counsel failed to unearth evidence showing that

**MEMORANDUM DECISION AND ORDER - 62**

the defendant, who suffered from organic brain damage, was beaten often as a child by his alcoholic father and left in a wire mesh dog pen.  *Id.* at 393.  Even in the face of strong aggravators, the Court deemed prejudicial the failure to develop this evidence of an extremely deprive childhood.  *See also Correll v. Ryan*, 539 F.3d 938, 953 (9th Cir. 2008) (finding prejudice based on defense counsel's failure to present evidence of the defendant's abusive childhood).

The theme which emerges from these cases is that prejudice exists when defense counsel unreasonably fails to uncover compelling evidence of the defendant's severely disadvantaged background that would have added color and depth to a previously spare mitigation case, and when the aggravating circumstances are not so overwhelming as to negate any probability of a different outcome.  That is the situation here.

Conversely, two cases on which Respondent relies, *Woodford v. Visciotti*, 537 U.S. 19 (2002), and *Bible v. Ryan*, 571 F.3d 860 (9th Cir. 2009), are readily distinguishable.  In both cases, the excluded mitigating evidence would have had minimal value in the face of strong aggravating circumstances.  For instance, in addition to the aggravated facts of the offense in *Visciotti*, the defendant had previously committed other violent offenses, including the knifing of one man and the stabbing of a pregnant woman as she lay in bed trying to protect her unborn

**MEMORANDUM DECISION AND ORDER - 63**

baby.  537 U.S. at 26.  These aggravating circumstances were found to be so strong by the state court that there was no reasonable probability that they would have been outweighed by somewhat general evidence of the petitioner's troubled family background.  *Id*.

In *Bible*, the defendant kidnapped, sexually assaulted, and murdered a nine-year-old child, and he had previously been convicted of sexual assault and kidnapping.  571 F.3d at 867.  Defense counsel presented the testimony of thirteen mitigation witnesses during a three-day sentencing hearing.  *Id*. at 870.  Given the aggravated nature of the offense and the robust mitigation case that had previously been developed, the Ninth Circuit held that counsel's failure to present speculative evidence that certain factors in the defendant's background may have contributed to a possible brain dysfunction was not prejudicial.  *Id*. at 872.

In contrast, the present case differs markedly from *Visciotti* and *Bible* on both the aggravating and mitigating side of the equation.  Here a single aggravating circumstance was found to exist, against which defense counsel offered only a few obvious mitigating factors – youth and lack of a violent criminal history – together with other evidence that was either not credible or lacked probative force given the facts of the crime – such as McKinney's supposed kind and gentle nature, his lack of leadership, and his impulsiveness.  Defense counsel unreasonably ignored a line

of investigation that would have revealed an "excruciating life history," as in *Taylor*, *Wiggins*, and *Rompilla*, which included regular beatings, forced drug use, sexual abuse, and the systematic participation in the rape of his sibling.

For all of these reasons, this Court concludes that the Idaho Supreme Court's adjudication of this claim on the merits resulted in an objectively unreasonable application of *Strickland*. McKinney is entitled to relief from his unconstitutional death sentence, and the State shall either begin a new capital sentencing proceeding, or impose a lesser sentence for murder in the first degree, within 180 days from the date of judgment.

## Other Capital Sentencing Claims

Because McKinney has established that he is entitled to relief from his death sentence based on constitutional error in the penalty phase, this Court will dismiss all other remaining claims seeking this same relief as moot. *See Hovey v. Ayers*, 458 F.3d 892 (9th Cir. 2002) (declining to reach other penalty phase claims because relief is already granted on claim of ineffective assistance of counsel at penalty phase). This includes the following grounds: 1(d), 3, 5 (sentencing portion only) 10, 11, 13, 15, 16, 18 (sentencing), 25 (sentencing), and 30-32.

## CERTIFICATE OF APPEALABILITY

In the event McKinney files a timely notice of appeal from the Court's

**MEMORANDUM DECISION AND ORDER - 65**

judgment, the Court on its own initiative has evaluated the claims within the

petition for suitability for the issuance of a certificate of appealability.  *See* 28

U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when

an appeal is taken by a petitioner, the district judge who rendered the judgment

shall either issue a certificate of appealability (COA) or state the reasons why such

a certificate should not issue.  Pursuant to 28 U.S.C. § 2253(c)(2), a COA may

issue only when the petitioner "has made a substantial showing of the denial of a

constitutional right."  This showing can be established by demonstrating that

"reasonable jurists could debate whether (or, for that matter, agree that) the petition

should have been resolved in a different manner" or that the issues were "adequate

to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473,

484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For

procedural rulings, a COA will issue only if reasonable jurists could debate (1)

whether the petition states a valid claim of the denial of a constitutional right and

(2) whether the court's procedural ruling was correct.  *Id.*

Applying these standards, the Court finds that reasonable jurists could

debate the Court's denial of relief on McKinney's claim that the admission of

Dovey Small's deposition testimony at his criminal trial violated his Sixth

**MEMORANDUM DECISION AND ORDER - 66**

Amendment right to confrontation (Claim 5). The Court also finds that reasonable jurists could debate its procedural ruling that AEDPA's provisions apply to this case, and if a COA is required on that issue, it shall be granted.

Conversely, for the reasons stated in this Memorandum Decision, the written decisions dismissing claims as procedurally defaulted or as a matter of law (Docket Nos. 166, 237), and the written decisions resolving McKinney's motions for an evidentiary hearing and expansion of the record (Docket Nos. 237, 288), the Court declines to issue a certificate of appealability with respect to all remaining issues or claims in this case.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that the Third Amended Petition for Writ of Habeas Corpus shall be conditionally GRANTED in part and DENIED in part, as set forth herein.

IT IS FURTHER ORDERED that the following claims are DISMISSED as moot in light of the relief that has been granted: 1(d), 3, 5 (sentencing portion only) 10, 11, 13, 15, 16, 18 (sentencing), 25 (sentencing), and 30-32.

IT IS FURTHER ORDERED that the Court shall issue a Certificate of Appealability over the Court's denial of relief on Claim 5 in the Third Amended Petition, to the extent that Petitioner claims that the admission into evidence of

**MEMORANDUM DECISION AND ORDER - 67**

deposition testimony violated his Sixth Amendment right to confrontation at his criminal trial.  The Certificate shall also include the Court's Order (Docket No. 184) that the provisions of the Anti-terrorism and Effective Death Penalty Act (AEDPA) apply to this case, if authorization to appeal is necessary for that issue. The Court shall not certify any other issue or claim for appeal in this case.

IT IS FURTHER ORDERED that upon the filing of a notice of appeal in this case, and not until such time, the Clerk of Court shall forward the necessary paperwork to the Court of Appeals for the Ninth Circuit for the docketing of an appeal in a civil case.



DATED:  **September 25, 2009**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**MEMORANDUM DECISION AND ORDER - 68**